Elizabeth SAMMONS, individually and as Administratrix of the Estate of Gail E. Sammons, Deceased, Plaintiffs Below, Appellants,

v.

DOCTORS FOR EMERGENCY SERVICES, P.A., Edward R. Sobel, M.D., and Family Practice Associates, Defendants Below, Appellees.

No. 40, 2006.

Supreme Court of Delaware.

Submitted: Sept. 13, 2006.
Decided: Dec. 4, 2006.
Corrected: Dec. 6, 2006.

John C. Phillips, Jr., Joseph J. Farnan, III, Brian E. Farnan (argued), Phillips, Goldman & Spence, P.A., Wilmington, DE, for appellants.

Mason E. Turner, Jr. (argued), Prickett, Jones & Elliott, P.A., Wilmington, DE; Colleen D. Shields (argued), Elzufon, Austin, Reardon, Tarlov & Mondell, P.A., Wilmington, DE, for appellees.

Before STEELE, Chief Justice, BERGER and RIDGELY, Justices.

STEELE, Chief Justice:

This is a medical malpractice action arising from Gail Sammons's death in which plaintiff-appellant, Elizabeth Sammons,[1] appeals a jury verdict for the defendants-appellees, Doctors for Emergency Services, P.A., Edward R. Sobel, M.D., and Family Practice Associates.[2] DFES, Dr.

---

1. The plaintiff-appellant is the mother of the deceased, Gail E. Sammons. When we use the name "Sammons," we refer to the plaintiff appellant. When we use "Gail," we refer to the deceased.

2. The original defendants were Christiana Care Health Services, Inc. (a/k/a Christiana Healthcare Systems, Inc. a/k/a Wilmington Hospital and Medical Center of Delaware), St. Francis Hospital, Inc., Doctors for Emergen-

Sobel, and Family Practice Associates treated Gail from January 2, 2002, until her death on January 5, 2002. Sammons's trial strategy focused on the defendants' alleged failure to diagnose sepsis which allegedly caused Gail's death. A Superior Court jury rejected Sammons's theory and found for the defendants.

Sammons argues in this appeal that the trial judges' abuse of their respective discretion on several evidentiary issues caused the adverse result.[3]

First, Sammons argues that the trial judge abused his discretion by precluding Sammons's expert, Dr. Bridges, from offering an expert opinion on causation and failure to diagnose sepsis. Sammons identified Dr. Bridges as her expert in pretrial discovery but did not disclose that Dr. Bridges would be offered to opine on causation and failure to diagnose sepsis. Later, Dr. Bridges offered his heretofore undisclosed opinion on causation and sepsis during a pretrial deposition. DFES counsel did not attend that deposition but asserts that he would have done so had he been put on notice that Dr. Bridges would opine on cause of death and failure to diagnose sepsis. Because Sammons did not put opposing counsel on notice that Dr. Bridges would so opine at his deposition, the trial judge did not abuse his discretion when he precluded Dr. Bridges from testifying regarding causation and failure to diagnose sepsis at trial.

Second, Sammons contends that the trial judge abused his discretion by permitting DFES to adopt Dr. Roques's designated expert, Dr. Zenilman, as their own, after Sammons dismissed Dr. Roques. Sammons complains that allowing Dr. Zenilman's opinion testimony at trial unfairly prejudiced her. Dr. Roques had disclosed Dr. Zenilman's opinion on July 15, 2005, well before the December 15, 2005 trial began. DFES timely notified Sammons that they would be using Dr. Zenilman as an expert after Dr. Roques was no longer a party to the case. Therefore, Sammons had ample notice of the nature and substance of Dr. Zenilman's opinions, and adequate notice that DFES would be calling him as their expert. Sammons has identified no unfair prejudice resulting from admitting Dr. Zenilman's testimony and, therefore, the trial judge did not abuse his discretion when he allowed DFES to present Dr. Zenilman's expert medical testimony.

Third, Sammons contends that the trial judge abused her discretion by permitting DFES's counsel to discuss Sammons's settlement with Christiana Care for the purpose of shifting liability to the settling defendant during his opening and closing statements. We hold that the trial judge did not abuse her discretion because DFES's counsel did not directly discuss any settlement amount, or the reason for settlement, but merely mentioned settle-

cy Services, P.A., Jamie E. Roques, M.D., Edward R. Sobel, D.O., Michael Baram, M.D., Ori Shokek, M.D., Amy Robinson, M.D., and Robert Rosenbaum, M.D. On March 12, 2004, Sammons filed a motion to amend her complaint to add Family Practice Associates, P.A. as a defendant, and the trial judge granted the motion. Sammons later settled with Christiana Care and St. Francis and dismissed her claims against Drs. Baram, Robinson, Roques, and Shokek. The remaining defendants are Doctors for Emergency Services,

P.A., Edward R. Sobel, and Family Practice Associates.

3. Because the original assigned trial judge who handled pretrial issues became involved in a lengthy bench trial, a different judge presided for trial. The previous judge ruled on the motion regarding the affidavit of merit and motions *in limine* but did not preside over the jury trial. We use "his" to identify the initially assigned judge and "her" to identify the judge who presided over the trial.

ment to help the jury understand the alignment of the parties and to determine *pro rata* fault, if necessary.

Fourth, Sammons argues that the trial judge abused her discretion when she refused to admit Gail's photograph. We hold that the trial judge acted within her discretion because the photograph was neither necessary to identify Gail nor was it relevant to any disputed issue in the case.

Fifth, Sammons argues that the trial judge abused her discretion by precluding Sammons from impeaching a DFES expert by crossexamining him on DFES's 2004 sepsis policy. Sammons did not establish at trial that this policy reflected the applicable standard of care at the time that defendants cared for Gail in 2002. Therefore, the trial judge properly concluded that a failure to follow the policy would not be relevant to contradict the expert witness's opinion on the standard of care applicable in 2002.

Sixth, Sammons argues that the trial judge abused her discretion by precluding Sammons's expert, Dr. Haines, from explaining his unavailability at trial during his videotaped testimony. We hold that the trial judge was within her discretion to give the jury a general instruction on witness unavailability rather than tell the jury the specific reason why the witness was unavailable.

Seventh, Sammons contends that the trial judge erred by permitting the father of an attorney associated with the law firm representing Dr. Roques to sit as a juror in the case. Dr. Roques was not a party at the time of jury selection, and there was no evidence that the juror had any knowledge about the case or his son's firm's former involvement. Therefore, the trial judge properly acted within her discretion when she permitted the attorney's father to sit as a juror.

Eighth, Sammons contends that the trial judge abused her discretion by giving the jury a curative instruction regarding Sammons's counsel's statements during closing rebuttal argument. After consideration of the record, we hold that the trial judge did not abuse her discretion because the trial judge's statements did not unfairly deny her a fair trial.

Ninth, Sammons contends that the trial judge abused her discretion by refusing to give her proffered instruction on cross claims and by improperly addressing the jury's questions. We hold that the trial judge adequately instructed the jury regarding the cross claims without providing them with confusing and unnecessary information that would have made it more difficult for them to make a reasoned and informed decision in the case. The trial judge's responses to the jury's questions fell within her properly exercised discretion because they were consistent with Sammons's theory of the case and reiterated the pattern jury instructions.

We also review the trial judge's decision to dismiss the case *sua sponte* under Superior Court Civil Rule 60(b) after the jury verdict and the entry of judgment. We hold that the trial judge abused her discretion when she dismissed the case *sua sponte* in the absence of a showing of fraud in the judicial process. Therefore, we vacate the trial judge's order dismissing the case and remand the case to the trial judge to reinstate the judgment entered after the jury verdict.

Accordingly, we AFFIRM in part, VACATE in part, and REMAND in part.

## FACTS AND PROCEDURAL HISTORY

Gail Sammons, 41, suffered from sickle cell disease. On January 3, 2002, at approximately 3:15 p.m., Gail arrived at St. Francis emergency room complaining of

pain similar to sickle cell crisis. On January 4, 2002, the staff treated Gail with pain medication and IV fluids, released her at approximately 2:10 a.m. and advised her to follow up with her doctor as soon as possible. Later that day, at approximately 12:55 p.m., an ambulance took Gail to Wilmington Hospital where Dr. Rosenbaum examined Gail at approximately 1:55 p.m. and diagnosed Gail as suffering from a sickle cell crisis. Dr. Perri, a resident, called Family Practice, Gail's primary care physicians, to admit Gail to the hospital. Family Practice residents, Dr. Robinson and Dr. Shokek, examined Gail. Dr. Robinson then called a Family Practice physician to discuss Gail's condition and develop a treatment plan. There is some dispute regarding the phone call and to whom Dr. Robinson spoke. Nevertheless, during that phone call, a Family Practice physician approved Gail's admittance to Wilmington Hospital. Dr. Shokek signed Gail's admitting order at approximately 6:30 p.m. The Family Practice residents' admitting diagnosis was: painful sickle cell crisis. The hospital staff took Gail to a hospital floor at approximately 10:45 p.m. where her condition deteriorated. On January 5, 2002, at approximately 12:00 a.m., Gail was unresponsive. The staff called a code blue, and pronounced her dead at 1:25 a.m.

Elizabeth Sammons, individually as the mother of Gail Sammons and as Administratrix of Gail Sammons's estate, filed this action in Superior Court against the physicians who treated Gail and their employers, alleging that their medical negligence caused Gail's death.

Shortly after Sammons filed her complaint in Superior Court, counsel for Christiana Health Services, Inc. and various employee doctors filed a motion seeking a ruling on whether Sammons's affidavit of merit and *curriculum vitae*, filed under seal with the complaint, complied with 18 *Del. C.* § 6853. A Superior Court judge ruled that "the Court believes that the affidavits are in order and comply with the statutory language as to each named defendant." As a result, the case proceeded, and the Superior Court judge kept the affidavit of merit confidential as required by statute.

Before the trial began, the parties filed motions *in limine*. On September 12, 2005, Family Practice and Dr. Sobel moved to preclude Sammons's expert witness, Dr. Bridges, from opining at trial regarding causation and failure to diagnose sepsis. Although Dr. Bridges offered this opinion in his August 25, 2005 deposition, Sammons had not disclosed this particular opinion regarding sepsis and causation in any of Sammons's pretrial discovery responses. Sammons's actual response to discovery directed to expert testimony identified him solely as an expert on sickle cell life expectancy.

On November 9, 2005, Sammons moved to preclude Dr. Zenilman[4] from testifying on behalf of DFES, Family Practice, or Dr. Sobel contending that none of these defendants had identified Dr. Zenilman as an expert.

On November 18, 2005, the trial judge entered an Order precluding Dr. Bridges from opining at trial on causation and failure to diagnose sepsis. The trial judge denied Sammons's motion *in limine* and permitted DFES to call Dr. Zenilman as its medical expert to offer his expert medical opinion disclosed in Dr. Roques's discovery response.

4. Dr. Roques, while a party, retained Dr. Zenilman as his expert, but Sammons dismissed her claim against Dr. Roques before trial.

The Superior Court held a jury trial from December 12, 2005 [5] to December 21, 2005. On December 21, 2005, the jury returned a verdict in favor of the remaining defendants, DFES, Family Practice and Dr. Sobel. After the entry of judgment, DFES moved to have the trial judge review Sammons's affidavit of merit regarding Sammons's expert that the initially assigned judge had approved in 2004.[6] On January 18, 2006, the judge who ultimately presided over the jury trial wrote a letter to Sammons's counsel stating that the affidavit of merit was deficient with respect to DFES, and, therefore, Sammons should not have been allowed to proceed against DFES. The trial judge also stated that she planned to hold a hearing with counsel and Sammons's expert, Dr. Munoz, to determine Sammons's counsel's efforts to comply with 18 *Del. C.* § 6853.[7] The trial judge noted that she needed to determine an appropriate remedy[8] but did not identify a remedy at that time.[9]

Sammons filed a motion for reargument of the post trial letter opinion and appeal-ed. Specifically, the appeal sought our review of (1) the trial judge's decision on the two motions *in limine* regarding Dr. Bridges and Dr. Zenilman, (2) various trial rulings, and (3) the trial judge's January 18, 2006 letter opinion. DFES filed a motion to stay the appeal pending resolution of the issues relating to the trial judge's January 18, 2006 letter opinion. On February 21, 2006, this Court granted the stay and remanded the case to Superior Court for the proceedings outlined in the trial judge's January 18, 2006 letter and for consideration of Sammons's motion for reargument. We retained jurisdiction under Supreme Court Rule 19(c).

On March 31, 2006, the trial judge issued an Opinion and Order denying Sammons's motion for reargument of the Superior Court's January 18, 2006 decision that the Affidavit of Merit failed to comply with the statutory standard in 18 *Del. C.* § 6853 with respect to DFES. The trial judge also entered an order dismissing Sammons's claim against DFES[10] but did not vacate

---

5. Because the assigned trial judge was involved in a lengthy Bench trial, the case was assigned to a different judge for trial. The previous judge ruled on the motion regarding the affidavit of merit and motions *in limine* but did not preside at trial.

6. The trial judge re-reviewing the affidavit of merit was a different judge than the one who originally approved the affidavit of merit in 2004.

7. *Sammons v. Doctors for Emergency Services, P.A.*, 2006 WL 1522479 (Del.Super.Ct.)

8. The trial judge suggested that an appropriate remedy might be "that the case should be dismissed against DFES under Rule 60(b), *nunc pro tunc.*" *Id.*

9. Although the letter opinion did not dismiss the case against DFES, the trial judge, in her March 31, 2006 Opinion and Order, indicated that her letter opinion of January 18, 2006 and dismissed the case. *Sammons v. St.*

*Francis Hosp., Inc.*, 2006 WL 1134890, at *8 (Del.Super.Ct.) ("For all of the foregoing reasons, the Motion for Reargument of **this Court's January 18, 2006 decisions dismissing this case** for failure to comply with 18 *Del. C.* § 6853 is hereby denied.") (emphasis added).

10. The trial judge stated:
 I am once again constrained to conclude that Plaintiff should never have been permitted to proceed against DFES in the first instance. In short, the Affidavit of Dr. Eric Munoz to support Plaintiff's claim of medical negligence against DFES did not then, and does not now, in light of the evidence produced at trial, pass statutory muster. **Therefore, in accordance with the applicable statute, Plaintiff's claims against DFES are hereby dismissed.** The Court will, upon application of DFES, consider whether additional remedies are appropriate, but will not offer such remedies *sua sponte. Sammons*, 2006 WL 1134890, at *2 (emphasis added).

the jury verdict before entering the order.[11]

DFES filed a motion to tax its attorneys' fees and costs against Sammons on April 6, 2006. On April 26, 2006, the trial judge issued a letter to counsel neither granting nor denying DFES's request for attorney fees. In that letter the trial judge did state that Sammons's *counsel* would be responsible for payment of any fees awarded. The trial judge also stated that she intended to issue a Rule to Show Cause directing Sammons's counsel to show why he had not violated Superior Court Civil Rule 11. The trial judge stated that she would schedule the Rule to Show Cause hearing after this appeal has been decided and she requested guidance from this Court regarding the appropriateness of the sanction to better assess the full extent of the expenses that DFES had incurred at the trial level and in defending the appeal. The trial judge returned the case to this Court on April 26, 2006.

On April 28, 2006, Sammons filed her Amended Notice of Appeal also seeking this Court's review of the trial judge's March 31, 2006 Opinion and Order and her rulings in her April 26, 2006 letter to counsel.

## DISCUSSION

**1. The trial judge did not abuse his discretion by limiting the scope of Dr. Bridges's trial testimony and by permitting Dr. Zenilman to offer testimony as DFES's medical expert.**

Sammons has two arguments relating to experts involved in the trial.

First, Sammons argues that the trial judge abused his discretion by granting Dr. Sobel and Family Practice's motion *in limine* to limit Dr. Bridges's testimony.[12] Sammons contends that the trial judge improperly precluded her expert, Dr. Bridges, from opining at trial that Gail suffered from sepsis during her visit to the emergency room and that the defendants' failure to diagnose sepsis caused Gail's death. Sammons argues that because she disclosed Dr. Bridges's opinion regarding sepsis and causation in his August 25, 2005 deposition before the discovery deadline,[13] and because that opinion critically affected her presentation of her theory of liability, granting the motion to exclude this testimony at trial unfairly prejudiced her.

Second, Sammons argues that the trial judge abused his discretion by permitting DFES to use Dr. Zenilman as their expert because DFES never identified him as their expert in discovery before the deadline for doing so. Sammons also argues that she was unfairly prejudiced because DFES expanded the scope of Dr. Zenilman's opinion beyond that proffered when Dr. Roques's identified him as his expert

---

11. The trial judge did not state under which rule she dismissed the case. Therefore, we assume that the trial judge followed through on her suggestion in the January 18, 2006 letter opinion and dismissed the case against DFES under Super. Ct. Civ. R. 60(b), *nunc pro tunc*.

12. The trial judge granted the motion in part and denied it in part. The part he denied is not an issue on appeal.

13. Sammons notes the discovery deadline as August 31, 2005. The parties stipulated to extending the discovery deadline to October 31, 2005, but the trial judge never entered an order formally acknowledging the parties' agreement to extend the discovery deadline.

witness. Sammons further contends that she did not have sufficient notice that Dr. Zenilman's testimony would include an opinion on cause of death because cause of death was not relevant to Dr. Roques's alleged liability or that of his employer, St. Francis. Sammons submits that the trial judge made inconsistent rulings on the admissibility of the parties' respective experts which resulted in unfair prejudice to her.

■■■ We review the Superior Court's evidentiary rulings restricting or allowing expert testimony under an abuse of discretion standard.[14] "When an act of judicial discretion is under review the reviewing court may not substitute its own notions of what is right for those of the trial judge, if his judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness."[15]

14. *Bush v. HMO of Del.*, 702 A.2d 921, 923 (Del.1997) (citing *Pinkett v. Brittingham*, 567 A.2d 858, 860 (Del.1989)).

15. *Coleman v. PricewaterhouseCoopers, LLC*, 902 A.2d 1102, 1106 (Del.2006) (citing *Chavin v. Cope*, 243 A.2d 694, 695 (Del.1968)).

16. *Coleman*, 902 A.2d at 1107 (citing *Valentine v. Mark*, 873 A.2d 1099 (Del.2005)).

17. Super. Ct. Civ. R. 16(b) provides, in pertinent part:
 *Scheduling and planning.*
 Except in categories of actions exempted by the Court as inappropriate, the judge shall, after consulting with the attorneys for the parties and any unrepresented parties, by a scheduling conference, telephone, mail, or other suitable means, enter a scheduling order that limits the time:
 (1) To join other parties and amend the pleadings;
 (2) To file and hear motions; and
 (3) To complete discovery.
 The scheduling order may also include:
 (4) The date, or dates for conferences before trial, a final pretrial conference, and trial; and
 (5) Any other matters appropriate in the circumstances of the case.

■■■ "[T]he trial court has discretion to resolve scheduling issues and to control its own docket."[16] Under Superior Court Civil Rule 16, the trial judge enters a trial scheduling order which governs pretrial conferences, scheduling, and trial management.[17] Superior Court Civil Rule 16 mandates that parties follow the trial judge's scheduling order, and these rules assure that the parties conduct discovery in an orderly fashion. "Parties must be mindful that scheduling orders are not merely guidelines but have full force and effect as any other order of the [Superior] Court."[18]

■■■ Parties must comply with the discovery rules by identifying expert witnesses and disclosing the substance of their expected opinions as a precondition to the admissibility of expert testimony at trial.[19] The Superior Court, in *Duncan v.*

The order shall issue as soon as practicable but in no event more than 120 days after filing of the complaint. A schedule shall not be modified except by leave of the Court upon a showing of good cause.

18. *Fletcher v. Doe*, 2005 WL 1370188 (Del.Super.Ct.2005) (Order) (The Superior Court judge allowed the plaintiff's expert to testify even though he did not disclose his expert until one day after the date mandated by the scheduling order because the defendant could not have been unfairly prejudiced as a result of the delay. This case illustrates why parties must comply with court mandated scheduling orders; however, upon application in order to avoid manifest injustice, a judge may relieve the parties of dates mandated by the scheduling order.).

19. *Bush*, 702 A.2d at 923 (citing *Stafford v. Sears, Roebuck & Co.*, 413 A.2d 1238 (Del. 1980)). *See* Superior Court Civil Rule 26(b)(4), which mandates the rules regarding experts, provided in pertinent part:
 (4) Trial preparation: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this Rule and

*Newton & Sons Co.*, recently discussed that Court's standard practice regarding scheduling orders and expert witness disclosure.[20] In *Duncan*, the plaintiff argued that she did not need to do anything more than to identify her expert witnesses and then defendants could take depositions to learn what those opinions might be. The trial judge disagreed:

> This is contrary to the scheduling order and this Court's practice. Plaintiff was to identify her experts and provide their reports as to their expert opinions. Then, Defendants would be on notice of the bases for the expert opinions, and, pursuant to the scheduling order, respond in kind as to their experts and supply the bases for their opinions by way of a report. It is not reasonable to require Defendants' counsel to go on a wild goose chase with Plaintiff's experts or to depose Plaintiff's experts without

the benefit of having the opinions and the medical or scientific reasoning for those opinions.[21]

## A. Dr. Bridges's expert medical testimony.

█ It is with the above described Superior Court practice in mind that we address the ruling limiting Dr. Bridges's expert testimony. Here, the trial judge's Superior Court Civil Rule 16(b) pretrial scheduling order required Sammons to identify expert witnesses on or before April 15, 2005.[22] On April 15, 2005, Sammons disclosed Dr. Bridges as an expert witness who would offer an opinion regarding sickle cell patients' life expectancies. Sammons's expert witness discovery response did not disclose that Dr. Bridges would be offered for an opinion on causation or a failure to diagnose sepsis.[23] At

---

acquired or developed in anticipation of litigation or for trial, may be obtained as follows:

(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

*See also* Superior Court Civil Rule 26(e)(1)(B) which sets forth the requirements for supplementation regarding expert witnesses:

(1) A party is under a duty seasonably to supplement the response with respect to any question directly addressed to ... (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of the person's testimony. Super. Ct. Civ. R. 26(e)(1)(B).

20. *Duncan v. Newton & Sons Co.*, 2006 WL 2329378 (Del.Super.Ct.2006).

21. *Id.* at *6.

22. The original plaintiff expert disclosure deadline was February 15, 2005. The trial judge extended the plaintiff expert disclosure deadline first to March 15, 2005, and then later to April 15, 2005.

23. Sammons's expert discovery response, in pertinent part, as it related to Dr. Bridges provided:

> Kenneth Bridges, M.D. will offer at trial an expert opinion as to Gail Sammons' life expectancy. Dr. Bridges has reviewed Gail Sammons' medical records as well as the postmortem report. After reviewing the information, it is Dr. Bridges' opinion, to a reasonable degree of medical certainty that, that Gail Sammons' life expectancy would have been 65 to 70 years of age. This opinion is based on Gail Sammons' infrequent Acute Pain Crisis (the records indicate previous ER treatments in 1999, 1996, and 1992) and the relative good condition of her organs. It is also based on the fact that Gail Sammons had a relative benign course of Sickle Cell disease during childhood, which is when most organ damage occurs. This is verified by the fact that Gail Sammons only decided to get tested for the genetic traits of a Sickle Cell patient after

Dr. Bridges's discovery deposition on August 25, 2005, Sammons's counsel asked him questions relating to causation and failure to diagnose sepsis over objections from counsel for Dr. Sobel and Family Practice. DFES counsel, however, did not attend the deposition. DFES's counsel contends that he saw no reason to attend when Sammons's discovery response purported to offer Dr. Bridges's expert testimony solely to establish Gail's sickle cell life expectancy.

Although Sammons argues that the trial judge should have permitted her to supplement expert disclosures under Superior Court Civil Rule 26(e) and that she reserved the right to supplement, amend, or modify her expert disclosures in her expert identification discovery response,[24] Sammons, in fact, did not supplement her expert disclosure or submit Dr. Bridges's proffered expanded opinion to the court or to opposing counsel before participating in Dr. Bridges's pretrial deposition. During oral argument, we specifically asked Sammons's counsel whether he had made any effort to supplement the expert discovery response and counsel stated that he had not.

The trial judge granted Family Practice and Dr. Sobel's motion to restrict the scope of Dr. Bridges's testimony reasoning that it would disrupt the orderly process of the court to allow parties to disclose expert opinions for the first time during trial depositions.[25] The trial judge stated:

> With respect to causation, I will prohibit Dr. Bridges from testifying about causation because no opinion about causation was disclosed at all by Dr. Bridges by the time of plaintiff's expert disclosures, which I believe the deadline was April 15, 2005. And it's just not sufficient that Dr. Bridges did testify about causation at his deposition on August 25 and it is also to me not significant that perhaps defendant's counsel explored some causation issues at deposition testimony. There was a trial scheduling order and it is just contrary to the trial scheduling order in this case as well as the practice in this Court to allow an opinion to be disclosed for the first time at a deposition that occurs after the deadline has passed for disclosure of expert opinions ... In this case it would just wreak havoc on the orderly development of expert's opinions if an opinion didn't have to be disclosed by the deadline and could be broached for the first time at a discovery deposition following that because, among other things, the parties challenging the expert need to know before they attend the deposition what the opinions are going to be. So for all of those reasons, the Court will bar Dr. Bridges from testifying regarding causation.

The purpose of the Rule 16 scheduling order and discovery deadlines are to improve the efficiency of trials. The expert identification deadline assists the parties in conducting useful discovery of expert's opinions. Pursuant to Rule 26, the expert disclosure statements should identify the expert's opinions and the basis for those opinions so that the opposing party can properly prepare for depositions and trial. Here, Sammons did not properly and timely disclose Dr. Bridges's opinion regarding

---

her brother died from complications of sickle cell disease. Dr. Bridges is available for deposition at the convenience of the parties.

**24.** Sammons's expert disclosure, in pertinent part: "Plaintiffs reserve the right to supplement, amend, and/or modify these disclosures based on the discovery of any additional facts and/or the development of any additional opinions."

**25.** The trial judge granted the motion in part and denied it in part. The part of the motion that was denied is not at issue in the present appeal.

causation and failure to diagnose sepsis before the expert disclosure date mandated by the trial judge's scheduling order. Contrary to Sammons's assertion, she did not cure the discovery deficiency simply by disclosing Dr. Bridges's opinion regarding a failure to diagnose sepsis and causation during a deposition scheduled by another party for discovery purposes. Further, Sammons's counsel neither moved to amend the Rule 16 scheduling order upon a "showing of good cause," supplemented their original expert disclosure to expand Dr. Bridges's opinion nor contacted DFES counsel to notify him of Dr. Bridges's expanded opinion before the scheduled deposition. Without notice of the proposed expanded expert opinion to be proffered, DFES was entitled to rely on Sammons's disclosure. DFES could fairly assume it to be an accurate statement of the expert's anticipated opinion at his deposition as well as later at trial. DFES relied on Sammons's expert disclosure statement, and did not attend the deposition. Therefore, the trial judge did not abuse his discretion when he granted Family Practice and Dr. Sobel's motion to restrict Dr. Bridges's trial testimony.

## B. *Dr. Zenilman's expert medical testimony.*

■ We now turn to Dr. Zenilman's expert medical testimony. Dr. Roques identified Dr. Zenilman as his expert medical witness on July 15, 2005.[26] Dr. Roques disclosed that Dr. Zenilman had standard of care opinions related to Dr. Roques's involvement and causation opinions related to Sammons's theory that Gail died from sepsis.[27] On October 27, 2005, Sammons agreed to dismiss Dr. Roques from the case. On October 28, 2005, DFES's counsel informed Sammons's counsel that he planned to call Dr. Zenilman at trial. Sammons cancelled Dr. Zenilman's deposition that was scheduled for November 2, 2005. DFES's counsel called Sammons's counsel to verify that Sammons's counsel did, indeed, wish to cancel the deposition. On November 3, 2005, DFES's counsel sent Sammons's counsel a letter informing him that Dr. Zenilman would testify on December 14, 2005, and further explained Dr. Zenilman's opinion.[28] DFES contends that they elaborated upon Dr. Zenilman's opinion in their letter because Sammons cancelled Dr. Zenilman's deposition and

**26.** According to the trial scheduling order, Defendant expert disclosures were due on July 15, 2005.

**27.** Dr. Roques expert disclosure, in pertinent part, as it relates to Dr. Zenilman, provides:

Dr. Zenilman is being offered as an expert in the field of infectious diseases with opinions on the standard of care for Dr. Roques, causation, and damages ... Zenilman [has] reviewed the Complaint, medical records, Plaintiff's expert reports and deposition transcripts taken to date ... Zenilman will opine that Dr. Roques met the standard of care in his treatment of [sic] Sammons. Dr. Zenilman will opinion that [sic] Sammons did not die from septic shock ... Zenilman will opine that all the treatment that was received by Ms. Sammons by Dr. Roques was within the standard of care. The standard of care for this patient did not

require admission to the hospital when she was seen at St. Francis and it was within the standard of care to discharge her that day. In addition, Dr. Zenilman will opine that Ms. Sammons did not die from septic shock and that the most likely cause of death was her aspirating on her own vomit ... All of ... Zenilman's opinions are based on reasonable medical probability.

**28.** The letter states, in pertinent part:

As previously indicated, it is Dr. Zenilman's opinion, within terms of reasonable medical probability, based on his review of these records and his training and experience in his subspecialty of infectious disease medicine, that Ms. Sammons did not die of septic shock. The most probable cause of death is aspiration of vomit and that her death was an acute event, not the result of gradual deterioration in her condition. No

DFES wanted to avoid an argument that Sammons did not have the benefit of understanding the specifics of Dr. Zenilman's causation opinion, which Sammons might have gained had she chosen to go forward with the deposition. Sammons contends, however, that DFES's letter contained "new" opinions and those opinions went beyond the scope of the initial opinions Dr. Roques had disclosed in his expert witness discovery response. On November 9, 2005, Sammons moved to preclude Dr. Zenilman from testifying on behalf of DFES, Family Practice, or Dr. Sobel contending that none of these defendants had identified Dr. Zenilman as an expert and that he, therefore, should not be permitted to testify on their behalf at trial. The trial judge denied the motion stating:

> The bottom line position that I have is that I believe the defendants should be allowed to call Dr. Zenilman for these reasons: One, the practice in New Castle County Superior Court, as I understand it, is that it is not uncommon for defendants to potentially rely on other experts. And I think plaintiffs were sufficiently on notice of that. I've heard their arguments to the contrary. Secondly, the opportunity for the deposition was right then and there available and Dr. Zenilman, as chief of infectious diseases at Johns Hopkins, obviously has an extremely busy schedule and it will be hard to schedule if the deposition was canceled. I think that although there is a claim that Saint Francis—there was

never a claim by plaintiffs against St. Francis that St. Francis caused the death. That's not sufficient for me to bar the testimony of Mr. Zenilman. I do think that the letter that [DFES's counsel] sent summarizing the further opinions of Dr. Zenilman are not beyond the scope of what Dr. Zenilman's conclusion or opinion was with respect to the causation of death, that she died of aspiration of her own vomit rather than sepsis.

The trial judge distinguished this case from *Russell v. K–Mart*[29] noting that the pretrial expert disclosure noted in *K–Mart* stated that the expert would "testify for Plaintiffs in this case. His CV is attached. The subject matter on which he will testify are [sic] contained in the records that have already been supplied to [defense] counsel." The trial judge denied Sammons's motion to preclude Dr. Zenilman's testimony because DFES's expert disclosure regarding Dr. Zenilman was much more specific than the expert disclosure in *K–Mart*.

We agree that Sammons had fair and sufficient notice that Dr. Roques was going to use Dr. Zenilman as an expert and for what purposes because Dr. Roques filed his expert disclosure on July 15, 2005, and was a party to the case up until October 27, 2005. DFES notified Sammons that they would be using Dr. Zenilman as an expert on October 28, 2005. Dr. Roques, Dr. Sobel, and Family Practice all reserved the right to use the other's experts.

source of infection was identified on autopsy, including the microscopic evaluation. Furthermore, had the patient been in septic shock, as contended by plaintiff, there would have been evidence of inflammation, particularly in the end organs that serve as filters (kidney, liver, lung), which was absent. The blood work was not diagnostic of sepsis in a sickle cell patient such as Ms. Sammons. Leukocytosis in these patients is often due to the physiological stress of a sickle crisis. Nevertheless, the possibility

of occult infection was properly considered at Wilmington Hospital and she was covered with broad-spectrum antibiotics. Likewise, the blood pressure was not diagnostic of sepsis, as the primary care notes clearly indicate that her normal blood pressure was 90–100/60–70.

**29.** *Russell v. K–Mart Corp.*, 761 A.2d 1, 3 (Del.2000) (holding that the trial judge did not abuse his discretion by limiting an expert's testimony to information disclosed in his reports and letters).

DFES asserted the right to call any witness "properly identified by any other party." [30] We can infer from the record, as could Sammons's counsel, that DFES did not disclose Dr. Zenilman as their expert at the outset of the trial because Dr. Roques planned to call him. Then, when Dr. Roques was no longer a party to the case, DFES's counsel timely informed Sammons of his intention to use Dr. Zenilman as an expert before the date Sammons had scheduled Dr. Zenilman's deposition.

Further, the information in DFES's November 3, 2005 letter did not improperly expand the scope of Dr. Zenilman's opinion. Rather, DFES's counsel provided Sammons with an expanded explanation of the scope of Dr. Zenilman's opinion in light of the fact that Sammons had chosen not to depose him. Although Sammons asserts that cause of death was not an issue with regard to St. Francis and Dr. Roques, Dr. Roques's expert discovery response did state that Dr. Zenilman would offer an opinion relating to cause of death, which was a significant issue in the case.[31] Therefore, Sammons had sufficient notice that Dr. Zenilman would, if asked, offer an expert opinion on causation. We hold that the trial judge properly exercised his discretion when he denied Sammons's motion.

**2. The trial judge did not abuse her discretion by permitting DFES's counsel to refer to Sammons's settlement with Christiana Care during his opening statement and closing argument.**

▇ Sammons argues that the trial judge abused her discretion when she al-

lowed DFES's counsel to refer to Sammons's settlement with Christiana Care during opening statement and closing argument. Sammons argues that DFES's statements were improper and prejudicial because they were made to persuade the jury that all liability lay with the settling defendants.

In her words, Sammons alleges that the comments were an attempt to "shift blame and infer that Christiana Care, not DFES, Dr. Sobel, or Family Practice, was liable." Sammons argues that counsel's interjection of comments on her settlement with Christiana Care denied her right to a fair trial under D.R.E. 408 and violated the standard set forth in *Alexander v. Cahill*,[32] thereby entitling her to a new trial.

Evidentiary rulings are reviewed for abuse of discretion.[33] D.R.E. 408 provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount.[34]

▇ The two principles underlying Rule 408 are: "1) the evidence of compromise is irrelevant since the offer may be motivated by a desire to terminate the litigation rather than from any concession of weakness of position; and 2) public policy favors compromise in settlement of dis-

---

**30.** DFES reserved this right in the pretrial stipulation.

**31.** Sammons alleged in her pleading that as a result of St. Francis's negligence, the risk of harm to Gail increased, which resulted in her death.

**32.** *Alexander v. Cahill*, 829 A.2d 117 (Del. 2003).

**33.** *Whittaker v. Houston*, 888 A.2d 219, 222 (Del.2005); *Wilmington Country Club v. Cowee*, 747 A.2d 1087, 1092 (Del.2000).

**34.** D.R.E. 408.

putes."[35] When evidence is offered for another purpose, however, Rule 408 "does not require exclusion of settlement related evidence."[36] In *Brown*, we found the trial judge's instruction to the jury about why a settling defendant was no longer part of the case was not improper; in fact, the purpose of the instruction was to avoid jury confusion and speculation about the alignment of the parties.[37]

In *Alexander*, we discussed the need for the trial judge or the parties themselves to disclose to the jury the fact that a third party defendant had settled to avoid confusion.[38] When considering whether to discuss settlements in the presence of the jury, the trial judge should "carefully exercise his discretion and balance the probative value of the evidence for a permissible purpose against the prejudicial effect and risk the evidence will be used for an improper purpose."[39] The trial judge, however, must be "more skeptical of the party's purpose" when a party seeks to admit evidence disclosing the facts of a settlement.[40]

In *Alexander*, the plaintiff, a passenger in a school bus, was injured in a multicar accident.[41] The trial judge allowed defendant's counsel to ask plaintiff on crossexamination whether she and her husband had reached a settlement against certain third-party defendants.[42] We found that D.R.E. 408 barred this testimony because "counsel asked the question for the purpose of persuading the jury that the persons to blame for the accident had already admitted liability, raising the question that the plaintiff's claim against [the remaining defendant] might be invalid ... by suggesting that the [plaintiff] had already been guaranteed some payment toward damages," rather than asking the question to clarify the alignment of the parties.[43]

In the present case, the trial judge properly allowed DFES's counsel to make remarks explaining that Christiana Care had settled during his opening statement and closing argument. In fact, statements regarding settlement were specifically discussed in a pre-trial conference. As the trial judge noted:

> [T]hey are allowed to do that under Alexander versus Cahill. What they are not allowed to do is ask the terms of the settlement or were you paid or anything like that ... It would be just inconceivable that a jury couldn't be informed of [settling defendants] that, otherwise they are not going to have any understanding as to why they are not here.

DFES's counsel, unlike defendant's counsel in *Alexander*, made statements conforming to the parties' pre-trial understanding. Sammons refers to the following during DFES's opening statement:

> You're going to hear in this case about the different responsibilities of different people within the Christiana Care system, who has the responsibility to do what. And basically when the orders are written, they are taken off by the

---

**35.** *Capital Mgmt. Co. v. Brown,* 813 A.2d 1094, 1100 (Del.2002).

**36.** *Id.* at 1100–01.

**37.** *Id.* at 1101.

**38.** *Alexander,* 829 A.2d at 125.

**39.** *Id.* (quoting *Schlossman & Gunkelman, Inc. v. Tallman,* 593 N.W.2d 374 (N.D.1999)).

**40.** *Id.*

**41.** *Id.* at 119.

**42.** *Id.* at 127.

**43.** *Id.*

nursing staff and the nursing staff has the responsibility to carry them out unless they have some problem, in which case they go back to the doctor. Well, in this case for the most part that simply didn't get done. But the failure of the nursing staff is subsumed within the claim that the plaintiff brought against Christiana Care, which has been settled.

Sammons also refers to the following from DFES's closing argument:

And there is a third possible mistake and we can't tell from the records, but it doesn't seem like anybody was attending for Ms. Sammons at the time she became sick and threw up. And if you believe that the mechanical asphyxia thing, as ugly as that is to think about, is what happened, maybe something could have been done had they been attending to her. But Christiana Care has settled. They're not here. That's their responsibility.

In *Alexander*, the defendant's statements during cross examination were improperly admitted and were contrary to the parties' pre-trial agreement that the third party settlement would only be mentioned during opening statements and in the judge's final instructions.[44] DFES's counsel did not reveal any amount of settlement and counsel used the statements to help the jury understand the alignment of the parties and to determine pro rata fault, if applicable. DFES's statements did not suggest that Sammons's claim against DFES may be invalid or that the jury should disregard DFES's wrongdoing simply because Sammons's might, inferentially have received some damages from a settlement with Christiana Care.

As in *Brown*, any prejudicial effect the statements may have had was outweighed

by the ample testimony presented to the jury during trial and the jury instructions given by the trial judge. The trial judge instructed the jury that Christiana Care had settled but specifically charged the jury to find whether DFES was "medically negligent;" "whether either or any of the defendants remaining in the case were negligent;" and, whether their negligence caused Gail's death. Although Christiana Care had settled, the trial judge instructed the jury that they "must determine whether Doctors for Emergency Services, Edward Sobel D.O., Family Practice Associates, P.A., as well as, Christiana Care Health Services and St. Francis Hospital or all of them were negligent and whether that negligence was the proximate cause" of Gail's death. The trial judge acted within her discretion when she permitted DFES's counsel to refer to the settlement as he did in his opening statement and closing argument. Accordingly, we affirm.

3. **The trial judge did not abuse her discretion by precluding Sammons from displaying Gail's photograph to the jury.**

Sammons argues that the trial judge abused her discretion when she refused to admit Gail's photograph because it was "relevant and probative of identity." At trial, Sammons's counsel argued for admission of the photograph to show the jury that "Gail" "was a person and that she existed." The trial judge refused to admit the photograph because it was not relevant, reasoning that the jury would not need to see a picture of Gail to understand that she was a person "who existed."

The standard of review for evidentiary issues on appeal is abuse of discretion.[45]

---

44. *Alexander*, 829 A.2d at 127.

45. *See Green v. St. Francis Hosp., Inc.*, 791 A.2d 731, 737 (Del.2002) (where we found that the trial judge did not abuse his discre-

In the present case, there was no dispute at trial that Gail was a deceased person who was once alive. The photograph was not unique and did not shed any light on any material issue in the case. Therefore, the photograph had no independent relevance. Accordingly, we conclude that the trial judge properly exercised her discretion by refusing to admit the photograph into evidence, and accordingly we affirm that ruling.

### 4. The trial judge did not abuse her discretion by precluding Sammons from impeaching a DFES expert by using DFES's 2004 sepsis policy.

 Sammons argues that the trial judge abused her discretion by not permitting Sammons to impeach DFES's expert and fact witnesses with DFES's 2004 sepsis policy. Sammons contends that she should have been permitted to impeach DFES's witness, Dr. Rosenblaum,[46] with the 2004 DFES policy because his testimony that Gail was not suffering from sepsis on January 4, 2002, contradicted the 2004 policy containing a protocol for diagnosing sepsis in emergency room patients. Initially, the trial judge refused to allow Sammons to impeach Dr. Rosenblaum with the 2004 policy because Sammons had not disclosed that policy in the pretrial stipulation. Later, the trial judge clarified her ruling by stating that it was not a proper basis for impeachment because "impeachment is used to demonstrate dishonesty." Sammons contends that the trial judge abused her discretion and misapplied the law regarding impeachment.

The standard of review for evidentiary issues on appeal is abuse of discretion.[47] The trial judge has discretion to determine which modes of impeachment may be used.[48] In general, impeachment can be conducted by "showing the existence of bias, a prior inconsistent statement, untruthful or dishonest character, or defective ability to observe, remember, or recount the matter about which the witness testifies."[49] "A witness may be impeached on cross-examination or by other evidence contradicting the witness as to a material matter or establishing some other ground for impeachment."[50] "When impeachment evidence is offered to show bias, competency, or contradiction, the admissibility of that evidence is controlled by DRE 402 and 403."[51] Under D.R.E. 402 "[a]ll relevant evidence is admissible, except as otherwise provided by statute or by these rules or by other rules applicable in the courts of this State."[52] D.R.E. 403 permits the exclusion of relevant evidence, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay,

---

tion by permitting a photograph and videotape to be introduced into evidence because the arrangement of the room was an integral part of each party's case at trial).

**46.** Dr. Rosenblaum is a DFES employee.

**47.** *Davis v. Maute,* 770 A.2d 36, 41 (Del.2001).

**48.** 81 Am.Jur.2d *Witnesses* § 830 (2006).

**49.** *Id.* (footnotes omitted).

**50.** *Id.* (footnotes omitted).

**51.** *Baumann v. State,* 891 A.2d 146, 148 (Del. 2005). *See also United States v. Winchenbach,*

197 F.3d 548 (1 st Cir.1999) (impeachment with proof of prior inconsistent statement is governed by Rule 403 not 608(b)); *United States v. Tarantino,* 846 F.2d 1384, 1409 (D.C.Cir.1988) (Admissibility of extrinsic evidence offered to contradict witness is governed by Rules 402 and 403, not 608(b)); *United States v. Lopez,* 979 F.2d 1024 (5th Cir.1992) (Rule 403 controls the admission of contradiction evidence).

**52.** D.R.E. 402.

waste of time or needless presentation of cumulative evidence." [53]

The record reflects that DFES's sepsis policy did not exist until two years after Gail's death. Therefore, it could not be used to impeach or contradict Dr. Rosenblaum's testimony because the 2004 protocol neither formalized nor purported to formalize the standard of care at the time that Dr. Rosenblaum examined Gail in 2002. If Sammons had provided a witness that established that the 2004 sepsis policy was consistent with the applicable standard of care for diagnosing sepsis when Dr. Rosenblaum examined Gail in 2002, then it may have qualified as "a material matter" with which Sammons might have contradicted his testimony. But because science and medicine evolve over time and the record discloses no information in that regard, the protocol for diagnosis of sepsis may have been different in 2002 than in 2004. Therefore, the trial judge did not abuse her discretion by refusing to permit Sammons to impeach Dr. Rosenblaum with the 2004 sepsis policy. Accordingly, we affirm that ruling.

5. **The trial judge did not abuse her discretion by precluding Sammons's expert, Dr. Haines, from explaining his unavailability at trial during his videotaped trial testimony.**

■ Sammons argues that the trial judge abused her discretion by excluding Dr. Haines's testimony explaining why he was not available for trial. We review for abuse of discretion.[54]

It is customary practice for the trial judge to tell the jury that a witness is unavailable for trial and that the reason for the witness's unavailability is not rele-

vant. Sammons offered Haines's testimony by videotape at trial because he unexpectedly was called to active military duty two months before trial. The trial judge would not permit Sammons to explain that military duty caused Haines's absence. Instead, the trial judge gave a general explanation regarding witness unavailability. In weighing the relevance of the reason he could not appear against the possible sympathy that reason might draw to Sammons, the trial judge opted for a general explanation. After considering the record, we conclude that the trial judge properly exercised her discretion. Sammons suffered no unfair prejudice from being denied the opportunity to tell the jury that military duty prevented Dr. Haines's from appearing at trial. Accordingly, we affirm.

6. **The trial judge properly exercised her discretion when she permitted the father of an attorney associated with the firm representing Dr. Roques's to remain on the jury.**

■ Sammons contends that the trial judge erred by failing (1) to dismiss or question a juror after learning that a juror was the father of an associate in the law firm representing Dr. Roques; and, (2) to give Sammons's proposed *voir dire*.

■ "A decision not to discharge a juror following *voir dire* into an incident will not be overturned without a showing of prejudicial abuse of discretion by the [trial judge]." [55]

The standard preliminary questions for the jury venire for Superior Court civil trials include the following questions:

---

53. D.R.E. 403.

54. *Davis,* 770 A.2d at 41.

55. *Skinner v. State,* 575 A.2d 1108, 1121 (Del. 1990) (citing *Williams v. State,* 494 A.2d 1237, 1243 (Del.1985)); *see also Styler v. State,* 417 A.2d 948, 953 (Del.1980).

Do you know anything about this case through personal knowledge, discussion with anyone, the news media, or any other source? ... The plaintiff is represented by _____, of the law firm _____. The defendant is represented by _____, of the law firm _____ ... Do you know the attorneys in this case or any other attorney or employee in their firms? ... Do you have any bias or prejudice either for or against the plaintiff or the defendant? [56]

Under 10 *Del. C.* § 4511(c), "[a] person who is not disqualified may be excluded from jury service by the Court only upon a finding that such person would be unable to render impartial jury service or would be likely to disrupt or otherwise adversely affect the proceedings." [57]

Sammons dismissed Dr. Roques from the case on October 27, 2005. Therefore, his attorneys were not involved at the time of jury selection. An attorney who worked for the law firm who had represented Dr. Roques [58] wrote a letter to the trial judge two days into the trial advising her that he believed that his father was a member of the jury.[59] The attorney informed the trial judge that he and his father had never discussed the case, that his father did not know anything about the case, and that his father did not know about either his or his firm's involvement in the case. On December 14, 2005, the trial judge met with the parties to discuss the issue, and Sammons requested that the trial judge remove the attorney's father from the jury. The trial judge decided to keep the father on the jury because there was no evidence that he knew anything about the case or

about his son's involvement in the case. The trial judge had asked the jury the standard *voir dire* questions, as well as specialized questions that counsel proposed at jury selection. At the time of jury selection, Dr. Roques was not a defendant in the case, and therefore neither he, the attorneys, nor the firm representing him were mentioned in the preliminary questions to the jury venire. The attorney's father gave no positive response to any of the questions asked of the venire. The trial judge noted that the name of the firm had not been mentioned at all during jury selection, and she stated that she would instruct the parties to avoid mentioning the firm during trial. We hold that the trial judge's finding that the juror's ability to render an impartial verdict had not been compromised does not amount to an abuse of discretion. The trial judge was within her discretion to permit the juror to stay on the jury because there was no evidence of partiality or bias toward any party. Accordingly, we affirm.

7. **The trial judge did not abuse her discretion by giving the jury a curative instruction concerning statements made by Sammons's counsel during closing rebuttal argument.**

Sammons argues that the trial judge abused her discretion by giving the jury a curative instruction concerning statements made by Sammons's counsel during rebuttal closing. Sammons contends that the trial judge's curative instruction was improper because Sammons's rebuttal closing statements were fully supported by the record. Therefore,

---

**56.** Del. P.J.I. Civ. § 1.1 (2000).

**57.** 10 *Del. C.* § 4511(c).

**58.** The attorney had been involved in the case by attending several depositions.

**59.** The attorney informed the judge that he had spoken with his mother who told him that his father was sitting on an eight-day trial. The attorney was not certain that his father was sitting on this particular case.

Sammons argues that she is entitled to a new trial.

▮▮▮▮▮ The standard of review on appeal of a trial judge's decision to give a curative instruction is abuse of discretion.[60] "To establish abuse of discretion the appellants must show that the improper comment was 'significantly prejudicial so as to deny them a fair trial.'"[61] In civil trials, "[a]ny effort [by counsel] to mislead the jury or appeal to its bias or prejudice is inappropriate and, where objection is made, the trial court is obliged to act firmly with curative instructions even where no objection is forthcoming until after summations."[62] The timing and nature of curative instructions to the jury is a matter for the trial judge, who, after having presided over the entire trial, is in a better position to determine whether a curative instruction should be given.[63]

Here, the alleged improper statement by Sammons's counsel during closing rebuttal closing was as follows:

> You know what else you didn't hear Doctors for Emergency Services talk about? Did you hear them once talk about the board. Once? Did they mention the board, the board that has the patients' name on it and shows her taken to the floor. If it's not their patient, why would [sic] it come off as soon as family practice residents came? Because it is their patient. The patient is still in the emergency room and they're supposed to care for the patient.

After an objection by DFES's counsel, the trial judge instructed the jury to disregard Sammons's counsel's argument on this issue by stating:

> Ladies and Gentleman of the Jury during [Sammons's counsel's] rebuttal closing argument he made reference to the fact that the name on the board in the emergency department—as long as her name, the patient's name remained there that the care remained the responsibility of the emergency physicians, and there was no evidence to suggest that that's how the transfer occurs or that the board itself in any way suggests or in any way is instrumental in making the change from the emergency room doctor's care to the primary care doctors, so [sic] you should disregard that comment.

After reviewing the record, we see no testimony or evidence either consistent with counsel's statement or the inference he wished the jury to draw from his statement. The trial judge's curative instruction, based on her recollection of the evidence, was intended to prevent the jury from drawing an inference inconsistent with the record. We are satisfied with the trial judge's curative instruction to the jury. Sammons has not convinced us, through her briefs or otherwise, that the trial judge's curative instruction to the jury so inaccurately represented the record that it unfairly prejudiced her and constituted an abuse of discretion. Accordingly, we affirm.

**60.** *Davis,* 770 A.2d at 41 (Del.2001) (finding that the trial court's decision not to provide a cautionary instruction after defense counsel referred to the accident in a personal injury action as a "fender-bender" constituted an abuse of discretion).

**61.** *DeAngelis v. Harrison,* 628 A.2d 77, 80 (Del.1993) (quoting *Shively v. Klein,* 551 A.2d 41, 44 (Del.1988)).

**62.** *Id.*

**63.** *See Jardel Co. v. Hughes,* 523 A.2d 518, 533 (Del.1987) (finding no abuse of discretion when the trial judge gave a curative instruction during general jury instruction rather than an immediate cautionary instruction).

**8. The trial judge did not err by refusing Sammons's request for jury instructions on cross claims and did not abuse her discretion when she responded to juror questions.**

Sammons argues that the trial judge erred when she denied Sammons's request for instructions regarding DFES, Dr. Sobel, and Family Practice's cross claims. Sammons also argues that the trial judge provided incorrect responses to two questions posed by the jury during its deliberations.

■■■■■ "The standard of review for a denial of a requested jury instruction is *de novo*." [64] "While some inaccuracies and inaptness in statements are to be expected in any [jury] charge, this court will reverse if the alleged deficiency in the jury instructions undermined the jury's ability to intelligently perform its duty in returning a verdict." [65] "A trial court's charge to the jury will not serve as grounds for reversible error if it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.'" [66] We will examine the jury instructions as a whole to make this evaluation.[67] "On request of the jury after submission of the cause, a trial court has power in open court to give additional instructions." [68] "A trial court acts in its discretion when deciding to give the jury a supplemental instruction." [69]

■■■■ We first will determine whether the trial judge erred by denying Sammons' request for jury instructions. Sammons requested that the trial judge instruct the jury about the bases for the cross claims. The trial judge denied her request and reasoned that it would unnecessarily confuse the jury because the jury did not need to know the specific details about the cross claims. The trial judge was satisfied that when the jury completed a verdict sheet allowing for apportionment of negligence they would understand the cross claims in issue.[70] The trial judge's final instructions

64. *Manlove v. State*, 867 A.2d 902 (Table) (Del.2005) (citing *Ayers v. State*, 844 A.2d 304, 309 (Del.2004)).

65. *Riggins v. Mauriello*, 603 A.2d 827, 830 (Del.1992) (citing *Probst v. State*, 547 A.2d 114, 119 (Del.1988)).

66. *Probst v. State*, 547 A.2d 114, 119 (Del. 1988) (quoting *Flamer v. State*, 490 A.2d 104, 128 (Del.1983)).

67. *See Flamer v. State*, 490 A.2d 104, 128 (Del.1983).

68. *Zimmerman v. State*, 565 A.2d 887, 890–91 (Del.1989) (citing 76 Am.Jur.2d *Trial* § 1046 (1975) (holding that giving a supplemental jury instruction on the theory of accomplice liability in response to jury questions was not reversible error)).

69. *Id.* at 891 (citing *Sheeran v. State,* 526 A.2d 886, 893 (Del.1987)).

70. Trial judge:

> I don't think it matters that they understand what these cross claims are. You [counsel] have to understand that they [jury] don't understand ... most jurors have not taken courses in civil procedure and don't understand this terminology. As it is I think the instructions are difficult enough for them [jury]. If you start using those terms freely you are going to lose them [jury]. If you look at the verdict sheet and the way we describe the responsibility of the jury to apportion negligence I don't think they [jury] needs to know that that's because of cross claims.
> The cross claim is the way it gets legally into Court but it's not the way the jury's frame of reference is. The jury's frame of reference is they have six different people they have to consider here, entities, and which ones of them, if any, have X percentage of negligence. And if you start saying cross claims and all of this other stuff I think it's highly confusing to them [jury] and ... it's not necessary based on the way the settling co-defendants instruction was given ... it's not normally used. It's subsumed in the way we do our verdict sheet.

explained that Christiana Care and St. Francis had settled with Sammons before the trial. The trial judge stated, "the parties who remain in this case, that is, Doctors for Emergency Services, Dr. Sobel, and Family Practice Associates, have asserted a cross claim against the settling defendants asserting that their negligence was the proximate cause of Gail Sammons' [sic] death." Then the trial judge further instructed the jury regarding apportionment of damages and the verdict form.

After consideration of the trial judge's ruling and the jury instructions as a whole, we find that the trial judge's refusal to instruct the jury about the bases of the cross claims did not constitute reversible error. The trial judge adequately instructed the jury regarding the cross claims so that they could make a reasoned and informed decision in the case without confusing the jury by overburdening them with unnecessary information.

■ We now determine whether the trial judge abused her discretion by responding to the jury's questions as she did. During deliberation, the jury sent out a note with questions. One of the questions was: "are we to determine if sepsis caused Gail's death or if medical negligence caused her death?" The trial judge met with the parties to discuss counsels' proposed responses to the question and then gave the jury the following answer: "the Plaintiff's theory against these defendants is that the death was caused by sepsis that these defendants failed to diagnose. If you decide that the patient did not die of sepsis, then you must find these defendants not negligent." Sammons contends

that the jury could decide whether the defendants' medical negligence *on any theory* caused Gail's death and that it would have been consistent with Sammons's theory of the case for the jury to find the defendants liable for any negligence proximately causing her death and that they were not limited to the theory that failure to diagnose sepsis proximately caused Gail's death.

The jury's question indicated that they may have been confused about whether they were limited to a theory that sepsis caused Gail's death or if they could find for the plaintiff if they found any other medical negligence by the remaining defendants caused her death. Put another way, could DFES, Family Practice, and Dr. Sobel be found liable even if the jury did not find that Gail died as a result of the defendants' failure to diagnose sepsis? The trial judge gave an adequate answer to the jury's question based on Sammons's theory of the case from the beginning. Sammons had to allege and prove a theory establishing a standard of care and a deviation from that standard of care that caused Gail's death.[71] Sammons's theory of the case throughout the entire trial was that DFES, Family Practice, and Dr. Sobel were liable because they failed to diagnose sepsis and that the defendants' failure to diagnose that condition resulted in Gail's death. Therefore, DFES, Family Practice, and Dr. Sobel could only be liable if the jury found that Gail died because of their failure to diagnose sepsis. The trial judge's instruction was consistent with Sammons's theory throughout the entire case and consistent with the mandate of 18 Del. C. § 6853(e).[72] Sammons cannot uti-

---

71. *See* 18 *Del. C.* § 6853(e): "No liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances

of the case and as to the causation of the alleged personal injury or death . . ."

72. Sammons's counsel made several statements during his opening statement that indicated that their theory of the case was that

lize a catchall category of medical malpractice; Sammons put the defendants on notice of her theory of the case. She offered expert medical testimony to support that theory. It was on that theory alone that the jury could find negligence and causation sufficient to establish liability. The trial judge properly exercised her discretion by focusing the jury on Sammons's theory of the case, and she gave an adequate response to the jury's question.

The jury also asked a question regarding whether DFES was responsible for a patient during the patient's entire stay in the emergency room. After hearing arguments from counsel, the trial judge decided to instruct the jury to rely on its own recollection of the evidence. She also reminded the jury that arguments of counsel are not evidence in this case. The trial judge did not abuse her discretion because her response was intuitively accurate and complied with the pattern jury instructions.[73] Accordingly, we affirm.

## 9. The trial judge abused her discretion by entering an order of dismissal under Superior Court Civil Rule 60(b) *sua sponte.*

We review the trial judge's order dismissing the case under Superior Court Civil Rule 60(b) *sua sponte* for abuse of discretion.[74]

Rule 60(b) contemplates relief only upon a party's motion by permitting a party to seek relief "from a final judgment, order, or proceeding."[75] Rule 60(b) however, "does not limit the power of a Court ... to set aside a judgment for fraud upon the Court."[76] Thus, although Rule 60(b) contemplates relief only upon a party's motion, a trial judge may provide relief under Rule 60(b) *sua sponte* when there is "fraud upon the court."[77] For a trial

---

the defendants failed to diagnose Gail with sepsis and she died from sepsis, for example:

> This is a case about doctors who failed to diagnose a condition that caused the death of Gail Sammons, Elizabeth Sammons's daughter ... There are two medical conditions that Gail was suffering from on January 4, 2002. The first is sickle cell anemia. The second was sepsis ... Sepsis is what cause her death on that day the evidence will show ... The evidence will show that Gail did not get that needed medical attention on January 4, 2002 and ultimately died because of the doctors' failure to diagnose her sepsis ... You will hear from the experts that these results from these labs, the CBC and urinanalysis, were alarming and along with her vital signs were shouting that Gail had sepsis to anyone who would listen ... They failed to recognize, however, that Gail was also suffering from sepsis despite the overwhelming evidence of it ... The evidence will show that some time between 6:30 and 8:40 p.m. Gail's untreated sepsis went into what is known as septic shock ... Her undetected sepsis was about to cause her death ... On behalf of Mrs. Sammons we submit that the evidence in this case will ... show ... that the defendants simply failed to recognize the critical nature of Gail's condition and her sepsis on January 4th, 2002; thus causing her untimely death.

Sammons's counsel reiterated his theory of the case in his closing argument:

> ... And what is bad about this case is that doctors failed to diagnose Gail with sepsis even though she had all the factors. And what is bad about this case is that because no doctor diagnosed Gail with sepsis her sepsis went untreated and caused her death.

73. Del. P.J.I. Civ. § 3.3 (2000).

74. *See Wife B. v. Husband B.*, 395 A.2d 358, 359 (Del.1978); *Battaglia v. Wilmington Sav. Fund Soc'y*, 379 A.2d 1132, 1135 (Del.1977).

75. Super. Ct. Civ. R. 60(b); *see* 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2865.

76. Super. Ct. Civ. R. 60(b); *see* Wright & Miller, § 2870.

77. Super. Ct. Civ. R. 60(b); *see Epstein v. Matsushita Elec. Indus. Co. (In re MCA, Inc.*

judge to provide relief from a final judgment on the ground that a party committed fraud upon the court, a "heavy burden" must be met.[78] Ultimately, there must be "a showing of 'the most egregious conduct involving a corruption of the judicial process itself.' "[79]

In the present case, the trial judge dismissed the case against DFES under Rule 60(b) *sua sponte.* Therefore, the trial judge's order of dismissal was permissible only if there was fraud upon the court. Although the trial judge found that Sammons's affidavit of merit did not comply with 18 *Del. C.* § 6853, the trial judge made no factual findings that Sammons committed fraud upon the court by presenting the affidavit of merit. The trial judge, in her January 18, 2006 letter opinion, indicated that she wanted to schedule a hearing to hear evidence on Sammons's counsel's efforts to comply with § 6853, and to determine to what extent Dr. Munoz, if any, was responsible for misleading Sammons's counsel or the court. The trial judge, however, did not conduct that hearing. Furthermore, the original trial judge had previously reviewed Sammons's affidavit of merit and concluded that the affidavit complied with § 6853.

Under these circumstances, Sammons's presentation of her affidavit of merit cannot be said to be egregious conduct "involving a corruption of the judicial process itself" at this stage of the proceedings. Therefore, we conclude that the trial judge abused her discretion when she dismissed the case under Rule 60(b) *sua sponte*; at the time she dismissed the case, she had no record evidence of fraud on the court that would permit DFES to seek relief following the jury's final judgment without a motion, a hearing, and the admission of evidence that established fraud. Accordingly, we vacate the trial judge's order dismissing the case and remand with instructions to reinstate the judgment.

For the foregoing reasons, the judgment of the Superior Court is **AFFIRMED** in part, **VACATED** in part, and **REMANDED** in part.

---

*S'holder Litig.),* 785 A.2d 625, 634 (Del.2001) ("'[A] trial court [under Court of Chancery Rule 60(b)] has the power 'to set aside a judgment for fraud upon the Court.' A court does not have to wait for a party to make a motion for relief under this section; rather a court may take independent action to relieve a party from a judgment pursuant to this rule.") (quoting Del. Ch. Ct. R. 60(b)); *see also* Wright & Miller, §§ 2865, 2870).

**78.** *Epstein,* 785 A.2d at 639.

**79.** *Id.* (quoting Wright & Miller, § 2870).