IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| R.T. VANDERBILT COMPANY INC., | § § § | No. 510, 2013 |
| Defendant Below- Appellant, Cross-Appellee, | § § § § § | Court Below:  Superior Court of the State of Delaware in and for New Castle County |
| v. | § § | C.A. No. N10C-10-315 |
| DARCEL GALLIHER, individually and as special administrator for the ESTATE OF MICHAEL GALLIHER, deceased, | § § § § § § | |
| Plaintiff Below- Appellee, Cross-Appellant. | § § § § | |

Submitted:  May 14, 2014
Decided:  July 24, 2014


Before **STRINE**, Chief Justice, **HOLLAND**, and **RIDGELY**, Justices.

Upon appeal from the Superior Court.  **REVERSED** and **REMANDED**.


Nicholas E. Skiles, Esquire, Joseph Naylor, Esquire, Swartz Campbell LLC, Wilmington, Delaware for Appellant / Cross-Appellee.

Of Counsel:  Pratik A. Shah, Esquire (*argued*), Patricia A Millet, Esquire, Ruthanne M. Deutsch, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C., for Appellant / Cross-Appellee.

David W. deBruin, Esquire, The deBruin Firm LLC, Wilmington, Delaware for Appellee / Cross-Appellant.

Of Counsel:  William A. Kohlburn, Esquire (*argued*), of Simmons Browder Gianaris Angelides & Barnerd LLC, Alton, Illinois for  Appellee / Cross-Appellant.

**RIDGELY**, Justice:

In this personal injury and wrongful death case, Defendant-Below/Appellant/Cross-Appellee R.T. Vanderbilt Company, Inc. ("Vanderbilt") appeals from a Superior Court judgment on a jury verdict of $2,864,583.33 plus interest to Plaintiff-Below/Appellees/Cross-Appellant Darcel Galliher ("Galliher"), individually and on behalf of the Estate of Michael Galliher. The decedent, Michael Galliher ("Michael"), contracted and died from mesothelioma as a result of exposure to asbestos or asbestiform material while employed by Borg Warner[1] at a bathroom fixtures facility. Vanderbilt provided industrial talc to Borg Warner, which is alleged to be the source of the substance that caused Michael's mesothelioma. At trial, Vanderbilt denied causation and claimed that Borg Warner was responsible because it did not operate the facility in a manner that was safe for employees like Michael.

Vanderbilt raises two claims on appeal. First, Vanderbilt contends that the trial court erred when it failed to instruct the jury on the duty of care required of Borg Warner, as Michael's employer. Second, Vanderbilt argues that the trial court erred when it failed to grant a new trial based on the admission of unreliable and inflammatory evidence that previously was ruled inadmissible. Among other

---

[1] The facility originally owned by Borg Warner became known as Artesian Industries in the 1970s and Crane Plumbing in the early 1990s. For simplicity, we refer to these entities collectively as "Borg Warner."

things, a witness for Galliher introduced hearsay, not subject to cross-examination, that Vanderbilt employees were "liars" and that Vanderbilt had spent millions of dollars "buying senators."

Galliher raises one claim on cross-appeal. Galliher contends that the trial court erred as a matter of law when it disallowed post-judgment interest for a certain period of months.

Vanderbilt introduced evidence at trial to show that Borg Warner breached the relevant standard of care. The trial court erred when it failed to provide any instruction to the jury on Borg Warner's duty of care to Michael, despite Vanderbilt's request that it do so. The trial court also abused its discretion when it denied Vanderbilt's motion for a new trial based upon the substantial prejudice resulting from the admission of evidence, not subject to cross-examination, that it had engaged in criminal conduct.[2] Accordingly, we must reverse the judgment and remand for a new trial. Because there will be a new trial, it is not necessary for us to address Galliher's cross-appeal concerning post-judgment interest.

### Facts and Procedural History

From 1966 to 1968 and 1970 to 2005, Michael was employed primarily in the cast shop filling ceramic molds at Borg Warner, a plant that manufactured bathroom fixtures in Mansfield, Ohio. Borg Warner used the NYTAL brand

---

[2] As a matter of federal law, 18 U.S.C. § 201 criminalizes the bribery of public officials, which includes Members of Congress.

3

industrial talc—which Vanderbilt mined, sold, and distributed to Borg Warner—to dust molds for the ceramics that were manufactured in the cast shop where Michael worked. Borg Warner used NYTAL talc in the cast shop until the late 1970s.[3] The cast shop was described as "dirty" and "hot."[4] A former Borg Warner employee testified that when he left the cast shop at the end of the work day his arms and clothes would be white from the dust. That former employee also testified that Borg Warner did not require its employees to wear masks in the cast shop until the mid- to late-1980s.

Michael was diagnosed with malignant mesothelioma in August 2010 and died from that condition in February 2011. In 2011, Galliher filed a wrongful death suit against Vanderbilt, alleging that Michael contracted mesothelioma as a result of exposure to Vanderbilt's NYTAL industrial talc, which contained asbestiform fibrous materials. Vanderbilt conceded that the industrial talc contained asbestiform minerals but denied that the talc contained actual asbestos or caused mesothelioma. Instead, Vanderbilt alleged that Borg Warner and a third party, CertainTeed Corporation, were responsible for Michael's death. Vanderbilt further alleged that Michael was negligent for failing to protect himself.

---

[3] By 1984, the talc used in the cast shop where Michael worked was Montana Treasure Talc, which, the parties agree, did not contain fibers that could have contributed to Michael's mesothelioma. NYTAL was used in the facility again from the mid-1980s until 1992 to make glaze in an area of the facility that was adjacent to Michael's work area. But the parties agree that Michael was not exposed to NYTAL after 1992.

[4] Appellant's Opening Br. Appendix at A308.

4

At trial, three different witnesses for Galliher made statements that previously were ruled inadmissible. Vanderbilt moved for a mistrial based on these statements and also moved for a judgment as a matter of law. Both motions were deferred until after the jury's verdict. In a prayer conference, Vanderbilt provided proposed jury instructions on Borg Warner's duty of care as Michael's employer. The trial court ultimately declined to include Vanderbilt's proposed instructions.

After deliberations, the jury returned a verdict in favor of Galliher, awarding $2,864,583.33 in damages. The jury further found Vanderbilt was one hundred percent liable for Galliher's damages, that Borg Warner bore no responsibility, and that Michael had not been negligent. Following the verdict, Vanderbilt renewed its motions for a new trial and for judgment as a matter of law, which were denied by the trial court. Galliher moved for costs and interest, which were granted except that post-judgment interest was deferred for nearly six months. This appeal followed.

### *Discussion*

Vanderbilt contends that the trial court erred when it failed to instruct the jury on Borg Warner's appropriate duty of care and abused its discretion when it refused to order a new trial because of the admission of unreliable and inflammatory evidence. This Court reviews the denial of a requested jury

5

instruction *de novo*.[5]  We review for an abuse of discretion the trial court's denial of a motion for new trial.[6]

"A party is not entitled to a particular jury instruction but does have the unqualified right to have the jury instructed on a correct statement of the substance of the law."[7]  "A trial court may not, *sua sponte*, refuse to instruct the jury on claims that have been pleaded and upon which evidence has been presented."[8]  Rather, "[t]he trial court must 'submit all the issues affirmatively to the jury' and must not ignore a requested jury instruction applicable to the facts and law of the case."[9]  "A trial court's charge to the jury will not serve as grounds for reversible error if it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.'"[10]

Vanderbilt argues that the trial court failed to adequately instruct the jury on the duties Borg Warner owed to Galliher.  The trial court's instruction on comparative negligence provided:

---

[5] *Sammons v. Doctors for Emergency Servs., P.A.*, 913 A.2d 519, 540 (Del. 2006) (quoting *Manlove v. State*, 867 A.2d 902, 2005 WL 277929, at *1 (Del. 2005)).
[6] *Cuonzo v. Shore*, 958 A.2d 840, 844 (Del. 2008) (citing *Young v. Frase*, 702 A.2d 1234, 1236 (Del. 1997)).
[7] *Koutoufaris v. Dick*, 604 A.2d 390, 399 (Del. 1992) (citing *Culver v. Bennett*, 588 A.2d 1094, 1096 (Del. 1991)).
[8] *North v. Owens-Corning Fiberglas Corp.*, 704 A.2d 835, 838 (Del. 1997) (citing *Asbestos Litig. Pusey Trial Grp. v. Owens-Corning Fiberglas Corp.*, 669 A.2d 108, 111–12 (Del. 1995)).
[9] *Id.* (quoting *Alber v. Wise*, 166 A.2d 141, 143 (Del. 1960)).
[10] *Bishop v. State*, 593 A.2d 589, 1991 WL 78470, at *3 (Del. 1991) (quoting *Probst v. State*, 547 A.2d 114, 119 (Del. 1988)).

6

Defendant claims that non-party Borg Warner/Artesian was at fault and that its fault caused or contributed to causing Michael Galliher's mesothelioma and death. Defendant also claims that Michael Galliher was at fault and that his fault caused or contributed to causing his mesothelioma and death.

Defendant, not Plaintiff, bears the burden of proof to show, by a preponderance of the evidence:

(1) that Borg Warner / Artesian was at fault and that its fault caused or contributed to causing Mr. Galliher's mesothelioma and death; and/or

(2) that Mr. Galliher was at fault and that Mr. Galliher's fault caused or contributed to causing his mesothelioma and death.

If you determine that damages should be awarded to the Plaintiff, you will consider and assign percentage of fault among Defendant and those above whom you find to have been at fault and whose fault contributed to causing Mr. Galliher's mesothelioma and death, as follows:

(1) the percentage of fault of the defendant;

(2) the percentage of fault that is attributable to Borg Warner / Artesian;

(3) the percentage of fault that is attributable to Michael Galliher.

The sum of these percentages must equal 100%.[11]

Vanderbilt claims that the trial court also erred when it failed to instruct the jury—as requested[12]—on Borg Warner's duty of care to its employees. At the

---

[11] Appellant's Opening Br. Appendix at A1055.

[12] Vanderbilt's proposed instructions provided:
   26 DUTY OF EMPLOYER—DEFENSE PROPOSED
   Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for

7

prayer conference, the trial court indicated that it believed that Vanderbilt's proposed jury instruction related to Borg Warner's duty of care as Michael's employer was too long and that it would tailor them, stating "I'll think of something for you."[13] But the final jury instructions did not include an instruction on Borg Warner's duty of care. And when Vanderbilt pointed out that there was no instruction on Borg Warner's duty of care, the trial court said, "I deliberately have removed those from the charge."[14] Because the trial court refused to provide any instruction to guide the jury in its deliberations on the responsibility of Borg Warner as a premise owner and employer, Vanderbilt argues that the trial court committed reversible error. We agree.

---

the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters.

27. DUTY OF EMPLOYER—DEFENSE PROPOSED
No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe.

Appellant's Opening Br. Appendix at A1025.
[13] *Id.* at A300.
[14] *Id.* at A312.

The parties agree that Ohio law governs substantive issues in this case. The Ohio Judicial Conference has developed model jury instructions that it encourages trial courts to use. In relevant part, Civil Chapter 617.11 of the Ohio Jury Instructions provides an instruction on the general duty of care of a premises owner:

> The owner of the premises owes a duty to a frequenter to use ordinary care for the frequenter's safety, to keep the premises in a reasonably safe condition, and to use ordinary care to provide notice of any concealed dangers of which the owner of the premises has knowledge, or which by using ordinary care should have discovered.[15]

Similarly, Ohio Revised Code §§ 4101.11 and 4101.12 impose an affirmative duty on employers to furnish a safe work environment and to prevent an employee from working in an unsafe environment.[16] This duty of care under Ohio law "is no more than a codification of the common-law duty owed by an owner or occupier of premises to invitees, requiring that the premises be kept in a reasonably safe condition, and that warning be given of dangers of which he has knowledge."[17] If the trial court believed that Vanderbilt's proposed jury instruction was too long, it could have done as it promised and narrowed the instructions Vanderbilt submitted or given a general instruction, similar to the one found in the Ohio Judicial

---

[15] Ohio Judicial Conference, *Frequenter*, 1 CV Ohio Jury Instructions 617.11(2) (2002).

[16] *See* Ohio Rev. C. § 4101.11 (providing that employers have a duty to protect employees and frequenters); *id.* § 4101.12 (providing that employers have a duty to furnish a safe work environment for employees and frequenters).

[17] *Eicher v. U.S. Steel Corp.*, 512 N.E.2d 1165, 1167 (Ohio 1987) (citing *Westwood v. Thrifty Boy Super Mkts., Inc.*, 278 N.E.2d 673, 674 (Ohio 1972)).

9

Conference's model instruction. The trial court also could have asked counsel for Vanderbilt to submit a more tailored instruction on the subject themselves.

But the jury instructions ultimately given did not provide *any* statement of the law as to Borg Warner's duty of care under Ohio law even though Vanderbilt contended that Borg Warner breached its duty of care to Michael. Rather, the trial court's instructions only asked the jury to determine if Borg Warner was "at fault" without giving the jury any guidance on what acts or omissions would establish fault on the part of an employer as a matter of law. This material omission regarding the substance of Ohio law left the jury without a correct statement of the applicable law and requires a new trial.

In its second claim on appeal, Vanderbilt contends that the trial court abused its discretion when it denied Vanderbilt's motion for a new trial because of four different statements involving three witnesses. The first statement occurred when defense counsel questioned Dr. Barry Castleman, an expert for Galliher, on various topics during cross-examination. Defense counsel asked Dr. Castleman about his book and any references to Vanderbilt:

> [Defense Counsel]. Does your book mention RT Vanderbilt?
>
> [Dr. Castleman]. Yes.
>
> [Defense Counsel]. Is that the one paragraph, there's one paragraph on RT Vanderbilt?

[Dr. Castleman]. The paragraph where Johns-Manville people are calling RT Vanderbilt liars.[18]

Then defense counsel asked Dr. Castleman about Vanderbilt's efforts to obtain favorable reports and regulatory rulings.

> Q. And RT Vanderbilt has been studying talc since the 1970s; correct?
>
> [Dr. Castleman]. Well, since government regulatory officials started to impose duties on them. Yes, Vanderbilt has reacted by coming forth with studies and statements of various kinds. They spent millions of dollars on that.
>
> [Defense Counsel]. How do you know they spent millions of dollars?
>
> [Dr. Castleman]. Just the volume of studies, as well as testimony that's emerged in the course of this history and unearthing this history. I figure 16 million dollars, I believe, was used in one document.
>
> [Defense Counsel]. Who gave the 16 million dollars, who was that testimony by?
>
> [Dr. Castleman]. I think it was by a worker at Vanderbilt talking about [what] one of the Vanderbilt family told the workers.
>
> [Defense Counsel]. So a talc worker, a miner or miller; right?
>
> [Dr. Castleman]. Right.
>
> [Defense Counsel]. Is reporting how much Vanderbilt spent on this?
>
> [Dr. Castleman]. How much the company owners told him they spent buying senators and lobbying the government, yes.[19]

---

[18] Appellant's Opening Br. Appendix at A182.

11

After this second statement, Vanderbilt objected, and the trial court told the jury to "disregard the statement about buying senators and governors."[20]

Vanderbilt claims that Dr. Castleman's statements, along with statements by Sean Fitzgerald, an expert for Galliher,[21] and Thomas Rogers, a Vanderbilt employee,[22] were sufficiently prejudicial to require a mistrial. As we explain below, Dr. Castleman's statement about Vanderbilt engaging in bribery is especially egregious and requires a new trial. Even the trial court openly worried whether "any amount of curative instructions" would "erase from the minds of the jury" the statements made by Dr. Castleman.[23] Therefore, we need not examine other testimony beyond Dr. Castleman's to reach our decision that the trial court abused its discretion when it denied Vanderbilt's motion for a mistrial.

To establish an abuse of discretion in the denial of a motion for a new trial, a party must demonstrate that a witness's improper comments were "significantly

---

[20] *In re Asbestos Litigation (Michael Galliher v. R.T. Vanderbilt Co., Inc.)*, No. N10C-10-315, slip op. at 11 (Del. Super Ct. Aug. 27, 2013) [hereinafter Op.].

[20] Appellant's Opening Br. Appendix at A183.

[21] At trial, Fitzgerald used a chart to illustrate for the jury certain studies that he had reviewed before reaching his conclusions that Michael's mesothelioma was caused by NYTAL talc. The chart included findings from a report that the trial court had deemed inadmissible. When Fitzgerald was cross-examined about the mathematical calculations in the chart he stated, "[t]he math isn't going to work because the math that I used included an analysis that I was -- I was told could not be a part of this." Appellant's Opening Br. Appendix at A233. Vanderbilt argues that the introduction of this excluded report was prejudicial.

[22] Rogers testified that there were rumors at the mine where NYTAL talc was mined that the materials they were mining contained asbestos. The trial court had previously ruled that testimony about the rumors was inadmissible hearsay. Vanderbilt argues that this hearsay was prejudicial.

[23] Op. at 12.

12

prejudicial so as to deny them a fair trial."[24] Where a party can establish that the statements were improper and prejudicial, the issue then becomes "whether the improper comments caused sufficient prejudice to the complaining party to warrant reversal or whether the prejudice was cured by the cautionary instructions given by the Trial Court."[25] In gauging the effect of admission of improper evidence, this Court—like the trial court below—considers "(1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken in mitigation."[26]

It is undisputed that Dr. Castleman's hearsay testimony that Vanderbilt employees were lying about the company's product and that Vanderbilt engaged in illegal conduct of bribing senators was improper. Our analysis thus centers on the prejudicial effect of this evidence. Under the first prong of the test, the case was close. Vanderbilt presented scientific studies which found that Vanderbilt's talc did not contain asbestos and had not been scientifically shown to cause mesothelioma. Galliher, on the other hand, presented expert testimony that Vanderbilt's talc did contain asbestos and that it had caused Michael's mesothelioma. Thus, whether Vanderbilt's talc contained asbestos that could

---

[24] *DeAngelis v. Harrison*, 628 A.2d 77, 80 (Del. 1993) (quoting *Shively v. Klein*, 551 A.2d 41, 44 (Del. 1988)).

[25] *Joseph v. Monroe*, 419 A.2d 927, 930 (Del. 1980) (citing *Univ. of Delaware v. Munson*, 316 A.2d 206, 208 (Del. 1974)).

[26] *DeAngelis*, 628 A.2d at 81 (citing *Hughes v. State*, 437 A.2d 559, 571 (Del. 1981)).

13

cause mesothelioma was a hotly contested issue with evidence presented going both ways on that dispositive question.

Under the second prong, the erroneous admission of the statements by Dr. Castleman was especially problematic because the statements went to the core of Vanderbilt's case.[27] Dr. Castleman's comments included impermissible character evidence that discussed the credibility and motivations of Vanderbilt as a company. Even though the central issue at trial was a scientific question—i.e., whether Vanderbilt's talc contained substances that caused mesothelioma—the answer to that question implicitly depended on the credibility of Vanderbilt as a company. In order for the jury to determine that Vanderbilt's industrial talc did not contain asbestos or otherwise cause Michael's mesothelioma, the jury would have to believe Vanderbilt's statements and official company reports. Thus, the inadmissible testimony provided by Dr. Castleman impermissibly undermined Vanderbilt's credibility on a key factual dispute at trial.

Finally, under the third prong, the trial court's curative response was insufficient to mitigate the prejudice caused by the impermissible testimony. The trial court failed to provide any curative instruction regarding the hearsay evidence about Johns-Manville employees. And while the trial court did instruct the jury to disregard Dr. Castleman's statement about "buying senators," it later worried that

---

[27] The trial court "expressed serious concerns" with Dr. Castleman's testimony and characterized his comments as "regrettable." Op. at 11–12.

14

"no amount of curative instructions will erase [it] from the minds of the jury."[28] That worry was fully justified because the inadmissible testimony was so derogatory that a simple admonishment to ignore that aspect of Dr. Castleman's testimony, while leaving the jury to accept the rest of his views as an expert witness, was clearly insufficient. Further, there was no curative instruction regarding the hearsay statements alleging that Vanderbilt spent sixteen million dollars on studies to undermine government regulatory action. Thus, the trial court's corrective action was insufficient to mitigate the prejudice caused by the admission of the evidence.

Galliher argues that Dr. Castleman's statements were not prejudicial because the inappropriate remarks occurred during cross-examination. But the record amply supports the inference that the trial court itself drew that Dr. Castleman intended to make his inadmissible statements regardless of defense counsel's inquiries.[29]

Because the trial court erred in instructing the jury and abused its discretion in denying Vanderbilt a new trial, we reverse the judgment of the Superior Court

---

[28] Op. at 12.

[29] The trial court explained:

> I will tell you that . . . one of the things that troubles me most is Dr. Castleman's volunteering, what I believe to be volunteering, about the senators in the hip pocket or – I think the words were that [Vanderbilt] bought senators, plural. I don't think that was invited by the question. I think, frankly, Dr. Castleman was intent on getting that to the jury and seized upon the moment that he could to put it before the jury.

Op. at 12 (omission in original).

15

and remand the case for a new trial. It is therefore unnecessary to consider Galliher's cross-appeal concerning the calculation of post-judgment interest.

## *Conclusion*

The judgment of the Superior Court is **REVERSED**, and this matter is **REMANDED** for a new trial.