# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EXPRESS SCRIPTS, INC. and UNITED BIOSOURCE LLC, | § § § | No. 62, 2020 |
| Defendants Below, Appellants/Cross-Appellees, | § § § § | Court Below: Superior Court of the State of Delaware |
| | § | C.A. No. N15C-02-233 CCLD |
| v. | § § | |
| BRACKET HOLDINGS CORP., | § § § | |
| Plaintiff Below, Appellee/Cross-Appellant. | § § § § | |

Submitted: December 16, 2020
Decided: February 23, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED.**

Kevin G. Abrams, Esquire, Michael A. Barlow, Esquire, Daniel J. McBride, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Derek L. Shaffer, Esquire (*argued*), Michael Lyle, Esquire, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C., Richard I. Werder, Jr., Esquire, Rollo C. Baker, Esquire, Silpa Maruri, Esquire, Dominic J. Pody, Esquire, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Attorneys for Defendants-Appellants/Cross-Appellees Express Scripts, Inc. and United BioSource LLC*.

David E. Ross, Esquire, Eric D. Selden, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Paul D. Clement, Esquire (*argued*), C. Harker Rhodes IV, KIRKLAND & ELLIS LLP, Washington, D.C.; Kevin M. Neylan, Jr., Esquire, KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Plaintiff-Appellee/Cross-Appellant Bracket Holdings Corp*.

**SEITZ**, Chief Justice:

United BioSource LLC ("UBC"), a subsidiary of Express Scripts, Inc. ("ESI") agreed to sell three of UBC's pharmaceutical research and development businesses to Bracket Holding Corp. ("Bracket"), a holding company formed by Parthenon Capital Partners, LP ("Parthenon") for the acquisition. In August 2013, Bracket and UBC signed a $187 million securities purchase agreement (the "SPA"). Except for claims involving deliberate fraud and certain fundamental representations, Bracket agreed to limit its remedy for breach of the SPA's representations and warranties to an insurance policy (the "R&W Policy") purchased to cover these claims.

After closing, Bracket claimed that ESI and UBC engaged in fraud by inflating the revenue and working capital of one of the divisions of the acquired companies. In an arbitration proceeding Bracket recovered $13 million under the R&W Policy for breach of the SPA's representations and warranties. Bracket then sued ESI and UBC for fraud in the Superior Court. A jury awarded Bracket over $82 million.

The parties have appealed from the jury verdict and judgment. We find one issue dispositive. The SPA provides unambiguously that, except in the case of *deliberate* fraud and certain fundamental representations, Bracket could only recover up to the R&W Policy's limits for breaches of the representations and warranties. Over ESI's objection, however, the Superior Court instructed the jury that it could

2

find for Bracket not only for *deliberate* fraud, but also for *recklessness*. A deliberate state of mind is a different kettle of fish than a reckless one. The court's erroneous jury instruction was not harmless—it violated a key provision of the SPA and how the parties allocated risk in the transaction. We therefore reverse the Superior Court's judgment and remand for a new trial. To be helpful to the court and the parties on remand, we also address one other meritorious issue raised by ESI and UBC in their appeal.

## I.

We review the facts in a light most favorable to the jury's verdict.[1] ESI is a Delaware corporation providing pharmaceutical support services and benefits management. In 2012, ESI acquired UBC and its three subsidiaries—Bracket Global Holdings LLC, Bracket Global K.K., and Bracket Global Limited. Parthenon, a private equity fund, formed Bracket to purchase the Company from UBC. To distinguish between Bracket Holding Corp., the acquisition entity, and the three UBC Bracket subsidiaries, we will refer to the acquisition entity as "Bracket" and the three subsidiaries as the "Company." We will also refer to ESI and UBC together as "the defendants."

---

[1] *Burgos v. Hickok*, 695 A.2d 1141, 1142 (Del. 1997). Unless otherwise stated, the facts are drawn from the Superior Court's opinion, *In re Bracket Hldg. Corp. Litig.*, 2020 WL 764148 (Del. Super. Ct. Feb. 7, 2020).

3

In the fall of 2012, UBC hired Credit Suisse Securities (USA) LLC ("Credit Suisse") as its financial advisor to market the Company and KPMG LLC ("KPMG") to perform sell-side due diligence. Credit Suisse prepared a Confidential Information Memorandum ("CIM"), while KPMG conducted a Quality of Earnings ("QoE") investigation, which led to a February 2013 QoE Report. After Parthenon received both reports, it submitted a letter of intent to purchase the Company. To price the transaction, Parthenon focused on a multiple to the Company's Earnings Before Interest, Taxes, Depreciation, and Amortization—"EBITDA" in the twelve-month period prior to closing ("TTM EBITDA").

During due diligence, Parthenon grew concerned about the high balance of unbilled accounts in the QoE Report for Scientific Services, one of the Company's divisions. It raised the issue with Jim Stewart, the Company's Vice President of Finance. Stewart responded that the high receivable balance came from contract change orders when additional work was authorized beyond the scope of the original contract but had not yet been reflected in a revised contract. According to Stewart, unexecuted change orders were common in the industry and did not pose collectability problems. KPMG did not express concerns about the collectability of the balances.

On July 12, 2013, Bracket and UBC entered the SPA. UBC represented that the January 2011 through March 2013 financial information in the disclosure

4

schedule supporting a $29 million TTM EBITDA was true and correct. UBC also represented that, as of May 31, 2013, the Company had $11.85 million in working capital, subject to a post-closing adjustment.

Soon after closing, Bracket believed it had been misled about the Company's finances. According to Bracket, the Company had inflated historical revenue by millions of dollars. The Company's unbilled receivable balance was way off. Contracts did not support the balances and the revenue recognized against them. The Company recognized revenue long after work ended. Revenue continued to be booked for closed out contracts and was uncollectible. Bracket claimed that the Company's working capital was a negative $2.7 million along with large unbilled receivables.

After some back and forth between the parties, Bracket settled on a negative $14 million in working capital, requiring an over $25 million post-closing working capital adjustment. Bracket attributed the shortfalls to overstated unbilled receivables. Bracket also believed that it overpaid for the Company by tens of millions of dollars based on the effect unbilled receivables had on revenue.

In October 2014, Bracket demanded arbitration to recover under the R&W Policy. The arbitration raised many of the same events that led to this litigation. Bracket recovered $13 million under the R&W Policy. The defendants did not participate in the arbitration.

5

In 2015, UBC filed an action in the Court of Chancery to compel Bracket to commence arbitration under Section 2.5(b) of the SPA to resolve the working capital dispute.[2] The court granted UBC's demand and ordered the parties to commence the working capital arbitration process under the SPA.[3] Under Section 2.5(b), each party submitted a proposed calculation of working capital. The arbiter issued a report, ruling in favor of UBC. The arbiter found that the "Final Working Capital" was $9,687,383, which gave Bracket a price adjustment of $504,591.[4]

Bracket then sued ESI, UBC, and Jim Stewart in the Superior Court for fraudulently inducing Bracket to purchase the Company. UBC responded with counterclaims for breach of contract and tortious interference for Bracket's failure to pay UBC under a separate contract—a Transition Services Agreement ("TSA"). At trial, Bracket called fact witnesses and an expert witness to show that Stewart recognized revenue for contracts before the work had been performed, that did not exist or had been terminated, and in amounts exceeding totals for active contracts. After a ten-day trial the jury found that the defendants committed fraud and that ESI aided and abetted UBC's fraud. The jury awarded Bracket $82.1 million in damages and UBC $2.2 million in damages for UBC's breach of the TSA.

---

[2] *In re Bracket Hldg. Corp. Litig.*, 2017 WL 3283169, at *4 (Del. Super. Ct. July 31, 2017).

[3] The Court of Chancery's Order stated that "the arbiter will not decide defendant Bracket Holding Corp.'s fraud claims pending in Delaware Superior Court . . . ." *Id.*; App. to Answering Br. on Appeal at B1–3 (Order, *United BioSource LLC v. Bracket Hldg. Corp.*, C.A. No. 10840-CB (Del. Ch. Nov. 12, 2015)).

[4] *In re Bracket*, 2017 WL 3283169, at *4.

The parties filed a flurry of post-trial motions. For purposes of this appeal, we focus on the Superior Court's jury instruction addressing the state of mind for proof of fraud. The Superior Court first addressed the state of mind requirement in its April 11, 2019 pre-trial opinion.[5] Bracket argued that the defendants should be liable not only for deliberate fraud, but for reckless conduct. The defendants objected and relied on the SPA's deliberate fraud limitation to recover more than the R&W Policy. The court concluded that it was "confident there will be a significant dispute over how the jury will be instructed regarding fraud and what [Bracket] needs to establish to support this allegation" but found that "the extent to which others may have had knowledge of or reasonably suspected [Stewart's conduct] will be one for the jury to decide."[6] Continuing, the court concluded that Bracket "will be required to establish that the intent of [the] [d]efendants, through their employees, was to knowingly create false financial documents . . . . [but] [t]he exact wording of the jury instructions will await the submissions by the parties."[7]

In a May 15, 2019 pre-trial hearing, the defendants raised the reckless versus deliberate jury instruction issue again, arguing that "it impacts the nature of the case statement that plaintiff has proposed. It may also influence the argument that plaintiff makes. So that is why the parties had agreed th[is] issue . . . could be

---

[5] *In re Bracket Hldg. Corp. Litig.*, 2019 WL 1762975 (Del. Super. Ct. Apr. 11, 2019).
[6] *Id.* at *7.
[7] *Id.* at *8.

addressed today as opposed to later during a charging conference."[8]  It appears that the parties interpreted the court's April 11 ruling differently.[9]  After the parties made their positions known, the court clarified its prior decision.  The court stated that the term "deliberate" was not "defined otherwise in the document," meaning that UBC could be liable for recklessness, not just intentional fraud.[10]

At trial, the defendants reasserted their objection and argued that there should be no "recklessness instruction at all" because "under the contract, only deliberate fraud is actionable."[11]  The court rejected the argument, stating that the court had already ruled on the recklessness issue earlier.[12]

The defendants renewed their objection to the fraud jury instruction in a post-trial motion for a new trial.[13]  Once again, the court turned away their argument.  The court reasoned that Delaware law requires an "express agreement" to alter the common law fraud state of mind requirement, which includes recklessness.[14]  The court found "no clear articulation of the parties' intent," and thus, the court "d[id]

---

[8] Ex. B to Opening Br. on Appeal at 61.

[9] *Id.* at 62 ("[The plaintiff's counsel]:  So to the extent that [the defendants] want to reargue this issue, I don't think it's needed because it's already been decided in your opinion."); *id.* at 65 ("[The defendants' counsel]:  We also thought this issue had been decided [i]n . . . Your Honor's opinion.").

[10] *Id.* at 71 ("[B]ut if [the defendants] have a situation where they should have known or recklessly hid themselves that is a sufficient basis to hold [the defendants] accountable also.  So we'll leave it at that.  It wasn't defined otherwise in the document."); *id.* ("That was my intent . . . .").

[11] App. to Opening Br. at A2002 (Trial Tr. at 131).

[12] *Id.* (Trial Tr. at 132).

[13] *See id.* at A2626–2360 (Defendants' Opening Br. in Support of Their Renewed Mot. for Judgment as a Matter of Law, Mot. for a New Trial, and Mot. for Remittitur at 8–12).

[14] *In re Bracket*, 2020 WL 764148, at *5.

not believe that the inclusion of one undefined term – 'deliberate' – in the *indemnification* section of the SPA alters the mental state required for common law fraud."[15] Thus, the court reaffirmed its prior ruling that the court properly instructed the jury that the defendants could be liable for fraud if they acted recklessly. The court denied the defendants' post-trial motion to overturn the jury's verdict.

## II.

On appeal, the defendants argue that the Superior Court erred by allowing Bracket to recover for breach of the representations and warranties not only for deliberate fraud, but for recklessness. They point to Section 9.6(d) of the SPA and its "deliberate fraud" requirement. In the absence of deliberate fraud, the defendants argue, the SPA limited Bracket to the "sole remedy" of the R&W Policy.[16] According to the defendants, because the fraud jury instruction conflicted with a fundamental provision of the SPA, they are entitled to a new trial.

Bracket responds that the SPA contains numerous provisions referring to fraud, which refer to common law fraud. When the SPA is read as a whole, Bracket argues, the defendants could be liable for common law fraud, which includes recklessness. Further, Bracket contends that "deliberate" fraud under the SPA covers intentional and reckless mental states. Finally, according to Bracket, if the

---

[15] *Id.* (emphasis in original).
[16] Opening Br. on Appeal at 22.

9

Superior Court erred, the error was harmless given what they characterize as overwhelming evidence of deliberate fraud.

On appeal, we review *de novo* the trial court's jury instructions.[17] While "jury instructions need not be perfect," they must "give a correct statement of the substance of the law and be reasonably informative and not misleading when read as a whole."[18] If the jury misunderstands the law, "its ability to perform its duty is undermined and substantial rights of the parties are affected."[19]

A.

In *ABRY Partners V, L.P. v. F & W Acquisition LLC*, the Court of Chancery recognized "a strong tradition in American law that holds that contracts may not insulate a party from damages or rescission resulting from the party's fraudulent conduct."[20] There is also "a strong American tradition of freedom of contract, and that tradition is especially strong in [Delaware], which prides itself on having commercial laws that are efficient."[21] The Court of Chancery in *ABRY Partners*

---

[17] *Spencer v. Wal-Mart Stores E., LP*, 930 A.2d 881, 885 (Del. 2007).

[18] *Chrysler Corp. (Del.) v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1034 (Del. 2003) (internal quotation marks and citation omitted); *see R.T. Vanderbilt Co., Inc. v. Galliher*, 98 A.3d 122, 125 (Del. 2014) ("A party is not entitled to a particular jury instruction but does have the unqualified right to have the jury instructed on a correct statement of the substance of the law.") (quoting *Koutoufaris v. Dick*, 604 A.2d 390, 399 (Del. 1992)).

[19] *Duphily v. Del. Elec. Co-op., Inc.*, 662 A.2d 821, 834 (Del. 1995). We note that ESI and Stewart are defendants but not parties to the SPA. For purposes of this appeal, the parties have been content not to distinguish the basis for liability among ESI, UBC, and Stewart. Thus, like the parties, we focus on the arguments made under the SPA.

[20] 891 A.2d 1032, 1059 (Del. Ch. 2006).

[21] *Id.* at 1059–60.

10

resolved the tension between Delaware's "distaste for immunizing fraud" and "the need for commerce to proceed in a rational and certain way," by concluding that a contracting party cannot, as a matter of public policy, "limit . . . exposure for its own conscious participation in the communication of lies to the Buyer . . . ."[22]  But when a party "knowingly accepted the risk that the [counterparty] would act with inadequate deliberation," then that party "may not escape the contractual limitations on liability by attempting to show that the [counterparty] acted in a reckless, grossly negligent, or negligent manner."[23]

The SPA—governed by Delaware law[24]—and its indemnification framework directly reflects the balance struck in *ABRY Partners*.  In Section 9.6(D) of the SPA, the parties addressed deliberate fraud and other states of mind and allocated the risks associated with post-closing liability for breach of representations and warranties:

> NOTWITHSTANDING ANY OTHER PROVISION HEREIN TO THE CONTRARY, EACH OF THE BUYER AND PARENT ACKNOWLEDGES AND AGREES, THAT FROM AND AFTER THE CLOSING, **EXCEPT IN THE CASE OF FRAUD**, PARENT SHALL NOT HAVE ANY DIRECT OR INDIRECT LIABILITY (DERIVATIVELY OR OTHERWISE) WITH RESPECT TO ANY BREACH OF ANY REPRESENTATION OR WARRANTY (OTHER THAN THE FUNDAMENTAL REPRESENTATIONS) MADE BY PARENT IN THIS AGREEMENT.  **IN FURTHERANCE OF THE FOREGOING**, THE BUYER AND PARENT EACH ACKNOWLEDGES AND AGREES THAT **EXCEPT IN THE CASE OF ANY DELIBERANT** [sic] **FRAUDULENT (I) ACT, (II)**

---

[22] *Id.* at 1061, 1064.
[23] *Id.* at 1064.
[24] App. to Opening Br. at A2587 (SPA § 10.9).

11

**STATEMENT, OR (III) OMISSION** (1) THE SOLE AND EXCLUSIVE REMEDY OF WITH RESPECT TO ANY BREACH BY PARENT OF ANY REPRESENTATION OR WARRANTY (OTHER THAN THE FUNDAMENTAL REPRESENTATIONS) CONTAINED IN THIS AGREEMENT SHALL BE SATISFIED SOLELY FROM THE R&W INSURANCE POLICY . . . .[25]

Section 9.6(D) is unambiguous. The parties agreed that, except for fraud and fundamental representations, the Parent—defined as UBC[26]—would not be liable for any breach of the SPA's representations and warranties. And absent deliberate fraud, Bracket's exclusive remedy against UBC was the R&W Policy.

The Superior Court "d[id] not believe that the inclusion of one undefined term – 'deliberate' – in the *indemnification* section of the SPA alters the mental state required for common law fraud."[27] We disagree. When sophisticated parties craft purchase agreements, they typically follow a time-tested template.[28] Specific to

---

[25] *Id.* at A2582–83 (SPA § 9.6(D)) (emphasis added). "Deliberant" is obviously a typographical error and means "deliberate." We will use deliberate in this opinion.

[26] *Id.* at A2512.

[27] *In re Bracket*, 2020 WL 764148, at *5 (emphasis in original). The SPA notes that "[t]he article and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement." App. to Opening Br. at A2587 (SPA § 10.8).

[28] *See* Robert Anderson & Jeffrey Manns, *The Inefficient Evolution of Merger Agreements*, 85 GEO. WASH. L. REV. 57, 64 (2017) ("To create [deal] documents, transactional lawyers do not write new documents from scratch, but instead work from one or more 'precedents' from past deals that provide a template of established law and practice with provisions that reflect firm-specific or partner-specific conventions. . . .The widespread use of precedent-based drafting means that the first draft of the terms of virtually every deal are based upon and adapted from a prior deal—its 'precedent'"); *see also* Victor Fleischer, *Deals: Bringing Corporate Transactions Into The Law School Classroom*, 2002 COLUM. BUS. L. REV. 475, 483 (2002) ("Forms and precedents are undoubtedly the backbone of corporate practice and there is often no reason to start from scratch.").

indemnification provisions, the buyer wants to be sure it is getting what is represented and secures representations and warranties specific to the seller's financial information. The seller wants to limit its liability for post-closing disputes over representations and warranties. The parties channel post-closing representation and warranty disputes to the indemnification provisions of their agreement.[29]

Here, the parties followed this well-worn path and used Section 9.6(D) to address fraud and allocate risk associated with post-closing disputes. Following Delaware law, the parties carved out deliberate fraud from the limits of the indemnification provision.[30] But for all other states of mind, Bracket agreed to limit

---

[29] *See White v. Curo Tex. Hldgs.*, *LLC*, 2016 WL 6091692, at *11 (Del. Ch. Sept. 9, 2016) (recognizing that "[d]eal-related indemnification provisions address post-closing risk allocation") (citation and internal quotation marks omitted); *CertainTeed Corp. v. Celotex Corp.*, 2005 WL 217032, at *3 & n.5 (Del. Ch. Jan. 24, 2005) ("In the context of a merger or asset acquisition, the term 'indemnification' refers generally to the responsibility retained by the seller to make the buyer whole for liabilities related to the assets sold or for breaches of representations and warranties."); *see also* ABA Mergers & Acquisitions Comm'n, *Model Stock Purchase Agreement with Commentary* 302–303 (2d ed. 2010) ("[I]t is customary in the acquisition of a privately held company for the buyer to be given a clearly specified right of indemnification for breaches of representations, warranties, covenants, and obligations, and against certain other remedies."); Glenn D. West & W. Benton Lewis, Jr., *Contracting to Avoid Extra-Contractual Liability—Can Your Contractual Deal Ever Really Be The "Entire" Deal?*, 64 BUS. LAW. 999, 1017 (2009) (discussing extra-contractual liability consequences in "carefully crafted deductibles and caps on a seller's obligation to indemnify a buyer for losses arising from breaches of contractually bargained-for warranties, which are designed to define precisely the parameters of each party's post-closing liability").

[30] *See Airborne Health, Inc. v. Squid Soap, LP,* 984 A.2d 126, 136–37 (Del. Ch. 2009) ("Because of Delaware's strong public policy against intentional fraud, a knowingly false contractual representation can form the basis for a fraud claim, regardless of the degree to which the agreement purports to disclaim or eliminate tort remedies."); *EMSI Acquisition, Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *9 (Del. Ch. May 3, 2017) ("Under *Abry* and its progeny, therefore, absent a contractual portal, the Plaintiff (Buyer) cannot reach the Defendants (Sellers) on an indemnification claim beyond the bargained-for limits (the Escrow Funds) unless Plaintiff can demonstrate that Defendants acted with an 'illicit state of mind' or 'knew that the Company's

its remedy to the R&W Policy for breaches of the SPA's representations and warranties.

Our reading of Section 9.6(D) is confirmed when read in conjunction with Article 4, which addresses the "Representations and Warranties of the Buyer."[31] Consistent with the indemnification limitations in Section 9.6(D), and specifically the carveout for deliberate fraud, the parties agreed in Section 4.6 (Insurance) that "[t]he R&W Policy shall not provide for, or increase, any liability of Parent or its Affiliates . . . except as may result in the case of any deliberate fraudulent (a) act, (b) statement or (c) omission."[32] Further, the R&W Policy had to include "a waiver by the insurer(s) that issued the R&W Policy of any and all rights of subrogation . . . except in the case of any deliberate fraudulent (a) act, (b) statement or (c) omission."[33] In other words, the scope of the R&W Policy had to "conform to the

representations and warranties were false.'") (quoting *ABRY PARTNERS*, 891 A.2d at 1064); *see also* Lou R. Kling & Eileen Nugent, *Negotiated Acquisitions of Companies, Subsidiaries, and Divisions*, § 15.02 (2020) (discussing the ambiguity problem of undefined fraud parameters and suggesting "a clause which narrowly defines fraud based on a concept of intentional, knowing misrepresentation by the Seller"); *Model Stock Purchase Agreement with Commentary* 294 ("If the sellers are successful in negotiating one or more liability-limiting provisions, they often agree to remain fully liable for 'willful' or 'intentional' misconduct such as fraud or intentional misrepresentation."); Steven M. Haas, *Contracting Around Fraud Under Delaware Law*, 10 DEL. L. REV. 49, 57 (2008) ("As one would expect, exclusive remedy provisions are intensely negotiated and contain various carve-outs for different occurrences. . . . Most often, these carve-outs exempt claims relating to intentional misrepresentations from the exclusive remedy provisions such that all claims except for fraud must be brought as indemnification claims.").

[31] App. to Opening Br. at A2552 (SPA art. 4).
[32] *Id.* at A2553 (SPA § 4.6).
[33] *Id.*

14

representation in Section 4.6."[34] The R&W Policy incorporated the deliberate fraud limitations—"[t]he insurer shall only be entitled to exercise rights of subrogation against the Seller(s) . . . if the Loss arose in whole or in part out of any deliberate fraudulent act, statement or omission."[35] Through Section 4.6, the parties made clear that deliberate fraudulent "acts, statements, and omissions" were not covered by the R&W Policy and the carrier could subrogate a claim for these actions and omissions. Otherwise, the R&W Policy was the exclusive remedy.

A plain reading of the SPA shows that the parties took great care to distinguish between deliberate fraud and other states of mind and conduct. If the defendants committed deliberate fraud, Bracket could recover damages in addition to the R&W Policy. Absent that, Bracket's sole remedy was a claim against the R&W Policy.

B.

Bracket argues that references to common law fraud throughout the SPA "fit together seamlessly with the indemnification provision in Article 9."[36] The argument goes as follows. Section 9.6(D) states that "[n]otwithstanding any other provision herein to the contrary, . . . *except in the case of fraud*," the defendants will not be liable for "any breach of any representation or warranty."[37] Section 9.8 states

---

[34] *Id.* at A2566 (SPA § 6.6).
[35] *Id.* at A586 (R&W Policy § 9.2).
[36] Answering Br. on Appeal at 27.
[37] *Id.* (emphasis in original) (quoting App. to Opening Br. at A2582–83 (SPA § 9.6(D))).

15

that "*[i]n the absence of fraud* and except for [Bracket's] and its Affiliates' rights under the R&W Policy," the SPA's indemnification provisions "shall provide the exclusive remedy for breach of any covenant, agreement or representation or warranty."[38] Section 9.8 also states that "*in absence of fraud*," the defendants will not be liable for breach of a "Non-Fundamental Representation," including the representations at issue here.[39] Without explaining further, Bracket concludes that, "[t]aken together, these provisions form a coherent liability regime that allows Bracket to hold Defendants liable in court if it can prove common-law fraud, and limits Bracket to recovering under the R&W Policy if it cannot."[40]

Bracket's attempt to import fraud references from other provisions into the indemnification provision suffers from glaring errors. First, it ignores the language in Section 9.6(D) that the indemnification provision supersedes "any other provision herein to the contrary," meaning anything in Section 9.8 or other SPA provisions that are inconsistent with Section 9.6(D).[41] In Section 9.6(D) the parties treated deliberate fraud as a matter separate from other general references to fraud in the SPA.[42] Further, Section 9.6(D)'s lead-in phrase following the general fraud

---

[38] *Id.* (emphasis and alteration in original) (quoting App. to Opening Br. at A2583 (SPA § 9.8)).
[39] *Id.* (emphasis in original).
[40] *Id.*
[41] App. to Opening Br. at A2582 (SPA § 9.6(D)).
[42] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

16

exception—"[i]n furtherance of the foregoing"—means that more is coming to refine the fraud exception. The parties made clear that, other than for instances of deliberate fraud, the R&W Policy is the exclusive remedy. Section 9.6(D)'s specific treatment of fraud also controls over general references to fraud elsewhere in the SPA.[43]

Next, Bracket resorts to grammatical rules to override the plain meaning of Section 9.6(D). It argues that "'delibera[te]' in §9.6(d) is an *adjective* that modifies the nouns 'act,' 'statement,' and 'omission,' not an *adverb* that modifies 'fraudulent.'"[44] Thus, according to Bracket, "[e]ven if Defendants were right to claim that 'deliberate' means 'intentional,' §9.6(d) would require only an intentional *act*, *statement, or omission*; it would not alter the scienter standard for whether such intentional act were *fraudulent*."[45] This is a tortured reading of Section 9.6(D). States of mind are often paired with, and modify, the legal description of claims that follow them.[46] Although grammatical parsing can at times be useful to clarify

---

[43] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 255 (Del. 2017) (recognizing the "settled rules of contract interpretation, requiring that the court prefer specific provisions over more general ones").

[44] Answering Br. on Appeal at 28 (alteration and emphasis in original).

[45] *Id.* at 28–29 (emphasis in original).

[46] *See* Glenn D. West, *That Pesky Little Thing Called Fraud: An Examination of Buyers' Insistence Upon (And Sellers' Too Ready Acceptance Of) Undefined "Fraud Carve-Outs" In Acquisition Agreements*, 69 BUS. LAW. 1049, 1074 (2014) ("defining fraud by adding a descriptive adjective" is a "step in the right direction" for a trend in U.S. markets to "define fraud with some specificity when including it as an exception to an [exclusive remedy] provision") (alteration in original) (citation omitted); West & Lewis, 64 BUS. LAW. at 1033 ("If your counterparty insists on a 'fraud exclusion,' limit the exclusion to 'intentional fraud . . . .' And make certain that the effect of such an exclusion . . . eliminate[s] the applicability of deductibles and caps as to those breached

17

ambiguous language,[47] here Section 9.6(D) has a plain meaning—the parties sought to distinguish deliberate fraud from other mental states.

Finally, Bracket claims that "deliberate" fraud can include recklessness. But as explained earlier, fairly read, the parties used Section 9.6(D) to distinguish "deliberate fraud" from other states of mind. Even though the parties did not define "deliberate," its use in context shows that it was meant to refer to an intentional state of mind. Dictionary definitions back this up.[48] Black's Law Dictionary defines "deliberate" as "1. Intentional; premediated; fully considered" and "2. Unimpulsive; slow in deciding."[49] "Deliberate," in its plainer meaning, is defined as "[o]f a person: that acts or takes decisions after careful thought or consideration; measured and

represented that were, in fact, 'intentionally fraudulent.'"); *see also*, *e.g.*, *In re Massey Energy Co.*, *Deriv. & Class Litig.*, 2011 WL 2176479, at *27 n.180 (Del. Ch. May 31, 2011) ("Typical exclusions [from D & O insurance coverage] include acts arising out of, based upon, or attributable to . . . committing any deliberate criminal or deliberate fraudulent act.") (alteration in original) (citation omitted).

[47] *See CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *16 (Del. Ch. Jan. 31, 2017) ("Despite the linguistic, grammar and punctuation arguments each side advances, I read this provision by what I view as its plain meaning in accordance with Delaware law."); 17A AM. JUR. 2D *Contracts* § 358, Westlaw (database updated February 2021) ("While a court, in construing a contract, will give due force to the grammatical arrangement of the clauses, it will disregard the grammatical construction if it is at variance with the intent of the parties as indicated by the contract as a whole.").

[48] *Lorillard Tobacco Co. v. Am. Legacy Foundation*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

[49] *Deliberate*, Black's Law Dictionary (11th ed. 2019).

thoughtful. Also: that acts purposely or with intent."[50] What the parties intended to describe here was an intentional state of mind, not recklessness.

A deliberate state of mind does not equate to a reckless state of mind.[51] The parties used "deliberate" to describe a specific state of mind. Bracket agreed that, absent deliberate fraud, its sole and exclusive remedy for breach of the representations and warranties was the R&W Policy. The Superior Court erred when it instructed the jury that it could find for Bracket if it proved that the defendants acted with a reckless state of mind.

C.

Bracket argues in the alternative that we should treat the legal error as harmless. Bracket claims that the "overwhelming evidence at trial . . . [that] showed that [the] [d]efendants committed intentional not merely reckless fraud" should

---

[50] *Deliberate*, Oxford English Dictionary (2d ed. 1989), *available at* Oxford English Dictionary Online (last visited February 21, 2021).

[51] *See Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) (distinguishing intentional torts from "negligent or reckless torts"); *Daniels v. Williams*, 474 U.S. 327, 334 & n.3 (1986) (distinguishing "something less than intentional conduct, such as recklessness . . ."); Restatement (Second) of Torts § 8A (1965) ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantially certainty, the actor's conduct loses the character of intent, and becomes mere recklessness[.]"); Restatement (Second) of Torts § 500 cmt. f ("Reckless misconduct differs from intentional wrongdoing in a very important particular. While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it. It is enough that he realizes or, from facts which he knows, should realize that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless. However, a strong probability is a different thing from the substantial certainty without which he cannot be said to intend the harm in which his act results.").

19

excuse the erroneous instruction.[52]  According to Bracket, the reckless instruction "did not 'undermine[] the jury's ability to intelligently perform its duty.'"[53]  We disagree.

As noted earlier, "[a] party is not entitled to a particular jury instruction but does have the unqualified right to have the jury instructed on a correct statement of the substance of the law."[54]  "While some inaccuracies and inaptness in statement are to be expected in any [jury] charge, this Court will reverse if the alleged deficiency in the jury instructions undermined the jury's ability to intelligently perform its duty in returning a verdict."[55]

The erroneous jury instruction was not harmless error.  Bracket was able to argue for a lesser mental state to establish liability notwithstanding the parties' agreement to limit fraud liability in excess of the R&W Policy to deliberate fraud.[56]  Rather than focus on deliberate or intentional misrepresentations, the jury was instructed that it could also find in favor of Bracket by focusing on the defendants' "recklessly indifferent" conduct, meaning the defendants "we[re] aware of and

---

[52] Answering Br. on Appeal at 31–32.

[53] *Id.* at 31 (alteration in original) (quoting *Sammons v. Doctors for Emergency Servs.*, *P.A.*, 913 A.2d 519, 540 (Del. 2006)).

[54] *R.T. Vanderbilt*, 98 A.3d at 125 (quoting *Koutoufaris*, 604 A.2d at 399).

[55] *Culver v. Bennett*, 588 A.2d 1094, 1098 (Del. 1991).

[56] *See* App. to Opening Br. at A2063 (Trial Tr. at 44) (the plaintiff's counsel stating in closing argument that "what this tells [the jury] is, [ESI] . . . knew or sure as hell should have known as of June 11[th], a month before we signed up to do the deal, there was something wrong with these financial statements.  There was something wrong with [Mr.] Stewart.").

consciously disregarded a substantial and unjustifiable risk."[57]  The jury instruction

misstated the law and undermined how the parties allocated risk in the SPA.[58]  The

defendants were entitled to a correct statement of the law.[59]

---

[57] *Id.* at A2087 (Trial Tr. at 139) ("[The Court]:  Bracket contends that UBC and ESI knew, or were recklessly indifferent to, the fact that the company's financial statements provided in the [SPA] . . . ."); *id.* at A2088 (Tr. Trial at 143) ("[The Court]:  The second element [of fraud] is that the defendant knew or believed that this representation or concealment was false, or that they were recklessly indifferent as to whether it was false.  [Bracket] is required to establish the defendant, at the time the [SPA] was executed, knew the financial documents attached to the SPA were false or to be recklessly indifferent as to whether they were false, and recognizing those documents would be relied upon by the plaintiff in determining whether to purchase the business, they certified them to be true and correct.  Now, 'reckless' means that a defendant was aware of and consciously disregarded a substantial and unjustifiable risk would result from the conduct.").

[58] *See*, *e.g.*, *R.T. Vanderbilt*, 98 A.3d at 127 (reversing and remanding for new trial where jury instructions "left the jury without a correct statement of the applicable law"); *Volkswagen of Am.*, *Inc. v. Costello*, 880 A.2d 230, 236 (Del. 2005) (reversing and remanding for a new trial after finding that erroneous jury instructions on landowner liability law meant that "the jury could not intelligently perform its factfinding function") (internal quotation makes omitted); *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 444 (Del. 1996) (reversing and remanding for new trial because erroneous jury instruction overstated the effect of the implied covenant of good faith in an at-will employment contract); *Riggins v. Mauriello*, 603 A.2d 827, 831 (Del. 1992) (reversing and remanding for new trial where the jury instruction "was inappropriate as a matter of law"); *Tydings v. Loewenstein*, 505 A.2d 443, 445 (Del. 1986) (reversing and remanding for new trial where jury instruction was incomplete as to the proper standard of care); *see also Duphily*, 662 A.2d at 834 ("It is fundamental that the jury have a basic understanding of the law which it is asked to apply in order to intelligently perform its duty in reaching a verdict. . . . When it is manifest, as here, that the jury has misunderstood the applicable law, its ability to perform its duty is undermined and substantial rights of the parties are affected.").

[59] *Sammons v. Doctors for Emergency Servs.*, *P.A.*, 913 A.2d 519 (Del. 2006), is distinguishable. There, even though the instructions were erroneous, the jury was still able to "make a reasoned and informed decision in the case."  *Id.* at 541.  Likewise, we found no error in the trial court's response to a jury question regarding whether the jury was limited to the plaintiff's theory of the case because the court's responses were consistent with the plaintiff's theory of the case and reiterated correct pattern jury instructions.  *Id.* at 541–42.  By contrast, this case presents a more fundamental problem—the jury instruction incorrectly stated what the plaintiff had to establish at trial to hold the defendants liable for fraud.  Under the SPA, Bracket only had recourse for deliberate fraud, but the trial court's instructions led the jury to believe, instead, that it could ground its judgment on a lesser standard—recklessness.

Although we reverse the Superior Court's judgment based on its erroneous fraud jury instruction, to be as helpful as possible to the court on remand, we address another meritorious evidentiary issue the defendants raised on appeal.[60]

Throughout the case, Bracket alleged that it calculated its purchase price based on a multiple of EBITDA during the TTM period. If the defendants overstated EBITDA, Bracket argued, it overpaid for the Company. But Bracket's overstated EBITDA claim depended on the financial statements represented in the SPA. In its summary judgment ruling, the Superior Court limited Bracket's fraud claim to the Company's March 2013 financial statements based on what it characterized as a representation that Bracket relied on those statements. The court ruled:

> [T]he financial statements that were certified in § 3.1 of the SPA are set forth in disclosure statement § 3.4(a). It is the representation as to these statements that Plaintiff alleges is false. It has also been represented to the Court that Plaintiff determined its pricing based upon these disclosure statements. Therefore, the Court believes it is the difference

---

[60] Bracket argues that the defendants raise their relevance argument for the first time on appeal. We are satisfied, however, that the defendants raised substantially the same argument below. *See* App. to Opening Br. at A1779 (Trial Tr. at 60) ("[The defendants' counsel]: But as a factual matter, [Bracket] ha[s] to establish that [Bracket] relied on the represented financials. And what the documents show is [Bracket] didn't."); *id.* at A1780 (Trial Tr. at 62) ([The defendants' counsel]: The fact that [Bracket] [is] asked multiple times what TTM did you base the purchase price on, it changes every other day. It demonstrates that [Bracket] didn't actually value the company in that way. [Bracket] [was not] simply relying on March TTM financials."); *see also id.* at A2637 (Defendants' Opening Br. in Support of Their Renewed Mot. for Judgment as a Matter of Law, Mot. for New Trial, and Mot. for Remittitur at 19) (arguing for a new trial because the defendants "attempted to proffer evidence showing that [Bracket] did not, in fact, determine its pricing based upon the March 2013 financial statements—and, therefore, that [Bracket] could not prove reliance on any actionable false statement.").

22

between the financial statements ending as of March 2013 and those recalculated by [Bracket's expert] that are at issue. As a result, the calculations set forth in Exhibit 2 of [Bracket's expert]'s report would appear to reflect the relevant difference and are the calculations that the Court will allow testimony about."[61]

At trial, the defendants sought to introduce three exhibits to show that Bracket allegedly relied on financial information not covered by the SPA's representations and warranties to price the transaction.[62] The Superior Court refused to admit the exhibits based on its summary judgment ruling. As the court ruled, "[i]t's what I said it was before. It's what it's going to be utilized for. . . . The Court made the ruling and they have relied upon it. You knew it up front[.]"[63] Then, post-trial, when the defendants raised the issue again, the Court ruled:

> As established before trial, Bracket relied upon the March 2013 financial statements in setting the purchase price for the transaction. The evidence that Defendants sought to introduce regarding Bracket's evaluation of other statements would have been prejudicial and irrelevant to whether Bracket was defrauded. The decision as to [the relevant exhibits'] exclusion was set forth in the Court's Memorandum Opinion of April 11, 2019, which resolved the dispute over the appropriate TTM period. As a result of the Court's [summary

---

[61] *In re Bracket*, 2019 WL 1762975, at *11.

[62] The three exhibits were (1) a Parthenon executive's affidavit stating that it relied in part on financial information outside the SPA's representations and warranties period to price the transaction; (2) emails between the Parthenon executive and Bracket's financial expert supposedly showing that Bracket set the purchase price based on June 2013 financial statements; and (3) spreadsheets purportedly showing that the multiples used to price the transaction were not tied to financial statements covered by the SPA. App. to Opening Br. at A2656–62; *id.* at A2665; *id.* at A2663, A2669–93.

[63] During trial the court also stated that "[t]his is all the argument that was made months ago," "[b]ut at the moment, the Court ruled that the financials that were important to the decision as to how they were going to proceed, end of . . . March and beyond that, it doesn't matter." App. to Opening Br. at A1779–80 (Trial Tr. at 61, 64); *see also id.* at A1899 (Trial Tr. at 64) ("The line of questioning is not relevant.").

judgment] ruling, the Plaintiff was limited to this period, which had a significant impact on the damages they were claiming. In spite of the Court's ruling, at trial, the Defendants tried to introduce, through non-expert witness testimony, evidence regarding other potential periods. This was simply a back door effort to get around the Court's previous ruling."[64]

It appears that the court misapprehended the basis for the defendants' use of the three exhibits. To prove its fraud claim, Bracket had to demonstrate, among other elements, reliance.[65] The defendants sought to introduce the exhibits to show that Bracket relied on financial information outside the March 2013 financial statements to set the purchase price. What Bracket relied on to fix the purchase price was both relevant and a question for the jury that was not susceptible to resolution at summary judgment.

Having concluded that the exhibits are relevant, under Delaware Rule of Evidence 403, to exclude the exhibits, the prejudice must substantially outweigh the probative value of the exhibits.[66] The court did not explain the nature of the

---

[64] *In re Bracket*, 2020 WL 764148, at *6.

[65] *DCV Hldgs.*, 889 A.2d at 958 ("To prevail on its claim of common law fraud, the Buyer was required to show that: . . . the plaintiff acted in justifiable reliance on the [defendant's] representation[.]"); *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000) ("A party claiming fraud must allege: . . . the plaintiff's action or inaction taken in justifiable reliance upon the representation; and . . . damage to the plaintiff as a result of such reliance.").

[66] D.R.E. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."); *see also Kiser v. State*, 769 A.2d 736, 741 (Del. 2001) ("Rule 403 requires the probative value of relevant evidence to be 'substantially outweighed' by the danger of confusing the issues or misleading the jury.").

prejudice. It appears from the court's rulings that the prejudice stemmed from the court's prior ruling that Bracket was limited to the March 2013 financials. Thus, as we understand it, Bracket would be unfairly prejudiced if it was limited to the March 2013 financial statements, but the defendants could use post-March financial statements to undermine Bracket's reliance.[67]

Once again, we think that the prejudice finding stemmed from a lack of clarity about the intended use of the evidence. The defendants sought to use the evidence to undercut Bracket's claim that it relied exclusively on financial statements covered by the SPA. Bracket could still rebut this evidence with proof that it relied on the March 2013 financial statements. Relevant evidence is, for the most part, prejudicial to the other party's case.[68] The prejudice must be unfair when balanced against

---

[67] *See In re Bracket*, 2020 WL 764148, at *6 ("As established before trial, Bracket relied upon the March 2013 financial statements in setting the purchase price for the transaction. The evidence that [the] [d]efendants sought to introduce regarding Bracket's evaluation of other statements would have been prejudicial and irrelevant to whether Bracket was defrauded. . . . In spite of the Court's ruling, at trial, the [d]efendants tried to introduce, through non-expert witness testimony, evidence regarding other potential periods."); App. to Opening Br. at A1780 (Trial Tr. at 64) ("The Court made the ruling and they [Bracket] have relied upon it. You knew it up front[.]").

[68] *See Lecompte v. State*, 150 A.3d 1200, 2016 WL 6519002, at *1 n.2 (Del. Nov. 2, 2016) (TABLE) ("Virtually all evidence is prejudicial to one party or another.") (quoting 2 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE § 403.04 [1] (2d ed. 2016)); *Stevenson v. State*, 709 A.2d 619, 632 (Del. 1998) ("Any evidence that is properly admissible . . . is prejudicial to the defendant in the sense that it enhances the likelihood of a conviction."); *see also Hinojosa v. Butler*, 547 F.3d 285, 295 (5th Cir. 2008) ("'Prejudice' to one party is the natural and intended consequence of the admission of evidence by another.").

relevance.[69]   On the record before us, the balance tips decidedly in favor of admission.

## IV.

The Superior Court's judgment is reversed.  The case is remanded for a new trial consistent with this opinion.  The issues raised on cross-appeal are moot.  Thus, we do not comment on the merits of the arguments on cross-appeal.

---

[69] *See*, *e.g.*, *Hines v. Joy Mfg. Co.*, 850 F.2d 1146, 1154 (6th Cir. 1988) ("In order to exclude evidence under [R]ule 403, it must be more than damaging to the adverse party; it must be unfairly prejudicial."); *Dollar v. Long Mfg.*, *N.C.*, *Inc.*, 561 F.2d 613, 618 (5th Cir. 1977) ("Of course, 'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party.  Virtually all evidence is prejudicial or it isn't material.  The prejudice must be 'unfair.'"), *cert. denied*, 435 U.S. 996 (1978); *see also Smith v. State*, 813 A.2d 1141, 2002 WL 31873704, at *2 (Del. Dec. 23, 2002) (TABLE) (explaining that the policy behind Rule 403 "is to provide the jury with an 'adequate factual base and breadth of understanding that it needs to render a fair verdict consistent with the truth'") (citation omitted).